**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
at KANSAS CITY, KANSAS

ERIC C. RAJALA,                                   )
Trustee in Bankruptcy for the Estate of           )
Generation Resources Holding Company, LLC         )
                                                  )        Case No. 10-CV-2243 MLB/KMH
                Plaintiff,                        )
                                                  )
vs.                                               )        JURY TRIAL DEMANDED
                                                  )
LOOKOUT WINDPOWER HOLDING                          )
COMPANY, LLC                                       )
a PA Limited Liability Company,                    )
                                                  )
        Serve Member/President:                   )
        Robert H. Gardner, President              )
        12328 Aberdeen,                            )
        Leawood, Kansas 66209                      )
                                                  )
FORWARD WINDPOWER HOLDING                          )
COMPANY                                            )
a PA Limited Liability Company,                    )
                                                  )
        Serve Member/President:                   )
        Robert H. Gardner, President              )
        12328 Aberdeen,                            )
        Leawood, Kansas 66209                      )
                                                  )
FREESTREAM CAPITAL, LLC,                           )
a Delaware Limited Liability Company              )
                                                  )
        Serve Registered Agent:                   )
        Capitol Services, Inc.                     )
        615 South Dupont Highway                   )
        Dover, DE 19901                            )
        Phone: (302)735-9719                       )
                                                  )

1

GARDNER FAMILY INVESTMENT )
COMPANY, LLC, a Missouri LLC )
                                )
    <u>Serve Registered Agent</u> )
    Jesse G. Maize )
    1008 W. 114th Terrace )
    Kansas City, MO 64114 )
                                )
STEVENS FAMILY INVESTMENT )
COMPANY, LLC, a Missouri LLC )
                                )
    <u>Serve Registered Agent</u> )
    Jesse G. Maize )
    1008 W. 114th Terrace )
    Kansas City, MO 64114 )
                                )
JOHN DOE COMPANY suspected to be )
known as Ansel Family Investment Company )
but whose name is currently unknown )
                                )
                Defendants. )

## COMPLAINT

COMES NOW Plaintiff, Eric C. Rajala, Trustee in Bankruptcy for Generation Resources Holding Company, LLC (hereinafter the "Trustee"), and for his Complaint against the defendants hereby states and alleges as follows:

## INTRODUCTION

The Trustee has sued numerous individuals and entities in a similar action before this Court styled <u>Rajala v. Gardner</u>, et al, Case No. 2:09-cv-02482 (the "Gardner" case). This Complaint mirrors an Amended Complaint sought to be filed in the Gardner case, except the parties in this Complaint were omitted from Gardner case. The Trustee is preparing a motion

2

to consolidate this case with the Gardner case. The "Parties" identified in the body of this Complaint are defendants (except the Trustee) in either the Gardner case or this case. The facts, parties and claims are so intertwined that separating them would be confusing and unnecessary, especially in light of the Motion to Consolidate.

## PARTIES

### The Trustee

1.     Plaintiff Eric C. Rajala is the duly appointed, qualified and acting Trustee in Bankruptcy for the estate of Generation Resources Holding Company, LLC, which was a Delaware Limited Liability Company formed on February 8, 2002, and which had its principle place of business at 11835 Roe Avenue, #150, Leawood, Kansas 66211 (hereinafter referred to as "GRHC"). GRHC was formed for the purpose of pursuing renewable energy development opportunities in the field of wind-generated electricity.

2.     On April 28, 2008, GRHC filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. in the United States Bankruptcy Court for the District of Kansas, Case No. 08-20957.

3.     Upon filing of the Chapter 7 Petition, the Bankruptcy Court having jurisdiction over GRHC's bankruptcy proceedings appointed plaintiff Eric C. Rajala as Interim Trustee in Bankruptcy therein to serve unless and until another trustee was elected at the §341 meeting of creditors.

4.      On August 28, 2008, meetings of creditors were held pursuant to 11 U.S.C. §341 in the Chapter 7 bankruptcy proceedings of GRHC and no other Trustee was elected, thus, plaintiff thereafter became the duly appointed, qualified and acting permanent Trustee in Bankruptcy for said debtor corporation and its estate.

## The Insiders

5.      Robert H. "Bob" Gardner and Robbin M. Gardner, husband and wife, are individuals who reside at 12328 Aberdeen, Leawood, Kansas 66209. Together they owned and controlled a one-third interest in GRHC. Robert Gardner was the Vice President of Development for GRHC and was a lawyer licensed and practicing in Kansas and Missouri.

6.      Defendant Gardner Family Investment Company, LLC, a Missouri LLC, was formed by Robert Gardner 1-19-2006 as a Missouri Limited Liability Company. It may be served by and through its registered agent, Jesse G. Maize, 1008 W. 114th Terrace, Kansas City, MO 64114. Upon information and belief, the Gardners transferred some or all of their claimed ownership in Lookout Windpower Holding Company (either MO and/or PA) and/or Forward Windpower Holding Company, LLC (MO and/or PA) and otherwise used this defendant to manipulate and hide assets from GRHC and its creditors.

7.      William W. "Bill" Stevens and Akiko N. Stevens, husband and wife, are individuals who reside at 115 Currituck Road, Newton, CT 06470. Together they owned and controlled a one-third interest in GRHC. William Stevens was the Vice President of Finance for GRHC.

4

8.      Defendant Stevens Family Investment Company, LLC, a Missouri LLC was formed by Robert Gardner 1-19-2006, as a Missouri LLC. It may be served by and through its registered agent, Jesse G. Maize, 1008 W. 114th Terrace, Kansas City, MO 64114. Upon information and belief, the Stevens transferred some or all of their claimed ownership in Lookout Windpower Holding Company (either MO and/or PA) and/or Forward Windpower Holding Company, LLC (MO and/or PA) and otherwise used it to manipulate and hide assets from GRHC and its creditors.

9.      R. James "Jim" Ansel and Virgina Z. Ansel, husband and wife, are individuals who reside at 37185 S. Ocotillo Canyon Drive, Tucson, AZ 05739. Together they owned and controlled a one-third interest in GRHC. James Ansel was President of GRHC.

10.     Defendant John Doe Company is intended to describe a business entity(ies) that Insiders James and/or Virginia Ansel may have formed or selected for the purpose of holding or owning some or all of the Ansel's claimed ownership in Lookout Windpower Holding Company (either MO and/or PA) and/or Forward Windpower Holding Company, LLC (MO and/or PA) and which was otherwise used to manipulate and/or hide assets from GRHC.

11.     Robert H. "Bob" Gardner and Robbin M. Gardner, Defendants R. James "Jim" Ansel and Virgina Z. Ansel, and Defendants William W. "Bill" Stevens and Akiko N. Stevens and their respective Family Investment Companies (to the extent events occurred after 1/19/2006) are hereinafter collectively referred to as the "Insiders" and fit the definition of that term in K.S.A. 33-201(g). The Insiders owned and controlled GRHC and owed it and its creditors

fiduciary duties including the duty of loyalty and due care. The Insiders transacted business and committed torts in Kansas which are the subject of this Lawsuit.

12.     GRHC Vice-President Robert Gardner, President James Ansel and Vice President William Stevens are hereinafter sometimes collectively referred to as the "Officers." The Officers controlled GRHC and owed it and its creditors fiduciary duties including the duty of loyalty and due care. The Officers transacted business and committed torts in Kansas which are the subject of this Lawsuit.

13.     The claims against the Insiders arise from and relate to the Insiders use of GRHC to develop three wind power projects named Stoney Creek Windpower, Forward Windpower and Lookout Windpower, and manipulation of separate holding companies owned by the Insiders to fraudulently isolate the Lookout and Forward projects from GRHC (i.e., Lookout Windpower Holding Company, LLC, (PA and/or MO) and Forward Windpower Holding Company, LLC (MO and/or PA)). The Insiders have and continue to try and force GRHC to pay all the debt from the projects (about $6 million) and the Insiders keep the entire sales proceeds for themselves (about $13 million).

14.     The Insiders formed and manipulated numerous corporate entities to carry out their scheme, naming themselves the sole owners of each including:

GRHC, LLC (Delaware: 2/8/2002)
Stony Creek Windpower, LLC (Delaware: 3/18/2002)
Stoney Creek Windpower Foreign Registration in PA (9/30/02)
GRHC, LLC Foreign Registration in PA (10/1/2002)
Forward Windpower LLC (Delaware: 8/26/2004)
Forward Windpower, LLC Foreign Registration in PA (9/7/2004)
Lookout Windpower, LLC (Delaware: 4/28/05)
Lookout Windpower, LLC Foreign Registration in PA (12/1/2005)
Lookout Windpower Holding Company, LLC (PA: 11/28/2005)
Forward Windpower Holding Company, LLC (PA: 11/28/2005)
Gardner Family Investment Company, LLC (MO 1/19/2006)
Stevens Family Investment Company, LLC (MO 1/19/2006)
Ansell controlled entity (John Doe Co. for now) (created or assigned ~ 1/19/2006)
Lookout Windpower Holding Company, LLC (MO: 12/1/2006)(not Reg. in PA)[1]
Forward Windpower Holding Company, LLC (MO: 12/1/2006)(not Reg. in PA)

15.     Each husband-wife Insider duo and/or Family Investment Company controlled and

claimed to own a one-third interest in each of these entities when they were created, except

for Stony Creek. The Insiders continue to claim that they own Lookout Windpower Holding

Company, LLC (both MO and PA), and Forward Windpower Holding Company, LLC (both

MO and PA), and are entitled to receive 100% of the $13 million sale price for LW and FW

without paying a dime of the $6 million in debt GRHC incurred to develop the projects.

**Edison Entities**

16.     Edison Mission Energy ("Edison") is a Delaware corporation with its principal place

of business in Irvine, California and was served with process through its registered agent,

Michelle J. Johnson at 18101 Von Karman Avenue, Suite 1700, Irvine, California 96212.

_____

[1]  The MO holding companies were presumably not registered in Pennsylvania as were
the PA holding companies, because the only function of the MO holding companies was to
collect the Redemption Price and pass it through to the Insiders and their respective Family
Investment Companies instead of GRHC or its creditors.

7

Edison owns and controls, directly or indirectly, the Mission Wind entities.

17.    Mission Wind Pennsylvania, Inc. ("Mission Wind") is a Delaware corporation with its principal place of business in Irvine, California and was served with process through its registered agent, The Corporation Trust Company, The Corporation Trust Center at 1209 Orange Street, Wilmington, Delaware 19801. On March 28, 2007, Mission Wind entered into Redemption Agreements with the Lookout and Forward project entities, and the Trustee herein claims amounts due under those agreements.

18.    Mission Wind PA Two, Inc. ("Mission Wind Two") is a Delaware corporation formed July 13, 2007, with its principal place of business in Irvine, California and was served with process through its registered agent, The Corporation Trust Center at 1209 Orange Street, Wilmington, Delaware 19801. Mission Wind Two claims to own some of the membership interests in LW and/or FW and, therefore, is subject to the Security Agreement executed by Mission Wind allowing remedies against the interests and property for non-payment of Redemption Agreement amounts.

19.    Mission Wind PA Three, Inc. ("Mission Wind Three") is a Delaware corporation formed July 13, 2007, with its principal place of business in Irvine, California and was served with process through its registered agent, The Corporation Trust Center at 1209 Orange Street, Wilmington, Delaware 19801. Mission Wind Three claims to own some of the membership interests in LW and/or FW entities acquired by Mission Wind and, therefore, is subject to the Security Agreement executed by Mission Wind allowing remedies against

the interests and property for non-payment of Redemption Agreement amounts.

20.    The Trustees claims against the Edison/Mission defendants seek enforcement of the March 28, 2007, Redemption Agreements and foreclosure of the security agreements of even date. To the extent LW and/or FW were not sold and transferred to the Edison/Mission defendants, the Trustee claims all financial benefits generated by those entities including without limitation profits, tax credits, depreciation, and other income items from March 28, 20007 to the present.

## The Lookout Project Defendants

21.    Lookout WindPower ("Lookout Windpower" or "LW") is a Delaware limited liability company formed by the Insiders April 28, 2005. It may be served through its Registered Agent: the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 (Phone: 302-658-7581).

22.    LW was a "Special Purpose Company" or "Project Company" created to own the Lookout project assets and serve as the vehicle by which the project would be sold. The Insiders named themselves as the owners of LW instead of GRHC whose assets, offices, and money was used to develop the project.

23.    LW's principle place of business was the GRHC offices located at 11835 Roe Avenue, Suite #150, Leawood, KS. LW transacted LW business in Kansas, kept LW corporate records and documents in Kansas, and used GRHC's offices and other resources for LW business in Kansas.

24.     Lookout WindPower Holding Company, LLC (PA) ("LWHC-PA") is a Pennsylvania limited liability company formed by the Insiders (the "organizer" was Robert Gardener) Nov. 28, 2005. LWHC-PA may be served with process through its organizer, member and officer, Robert Gardner, 12328 Aberdeen, Leawood, Kansas 66209. LWHC-PA consented to and did have its attorney accept service on its behalf. LWHC-PA was formed as a vehicle to hold and transfer membership interests in LW.

25.     Lookout WindPower Holding Company, LLC (MO) ("LWHC-MO") is a Missouri limited liability company formed by the Insiders (the "organizer" was Robert Gardener) on December 1, 2006. LWHC-MO may be served with process through its registered agent Jesse G. Maize, 1008 W. 114th Terrace, Kansas City MO 64114. LWHC-MO's attorney consented to and did accept service on its behalf.

26.     The Trustee's claims against LW are for unjust enrichment in that LW has retained the benefit of development services provided by GRHC without paying for them.

27.     The Trustee's claims against LWHC-MO include disgorgement of the money it was paid on March 28, 2007, for fraudulently transferring LW membership interests and conspiracy.  On March 28, 2007, LWHC-MO was paid $1,000,000 (of which $250,000 went to defendant FreeStream) and is owed approximately $10,507,000 by Edison/Mission Wind for the purchase of LW, and those funds rightfully belong to GRHC.

28.     The Trustee's claims against LWHC-PA include disgorgement of any money it was paid March 28, 2007, for fraudulently transferring LW membership interests, disgorgement

of profits (whether paid previously, now owed or to become due) earned from LW project operation (commercial operation was achieved in late 2008) and disgorgement of monies and benefits related to LW including tax credits, depreciation or other tax benefits as those funds rightfully belong to GRHC.

### The Forward Project Defendants

29.    Forward WindPower ("Forward Windpower" or "FW") is a Delaware limited liability company formed by the Insiders August 26, 2004. FW was served through its Registered Agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 (Phone: 302-658-7581).

30.    FW was a "Special Purpose Company" or "Project Company" created to own the Forward project assets and serve as the vehicle by which the project would be sold. The Insiders named themselves as the owners of FW instead of GRHC whose assets, offices, and money was used to develop the project.

31.    FW's principle place of business was the GRHC offices located at 11835 Roe Avenue, Suite #150, Leawood, KS. FW transacted FW business in Kansas, kept FW corporate records and documents in Kansas, and used GRHC's offices and other resources for FW business in Kansas.

32.    Forward WindPower Holding Company, LLC ("FWHC-PA") was formed Nov. 28, 2005, as a Pennsylvania limited liability company. FWHC-PA may be served with process through its organizer, member and officer, Robert Gardner, 12328 Aberdeen, Leawood,

Kansas 66209.

33.     Forward WindPower Holding Company, LLC ("FWHC-MO") was formed December 1, 2006, by the Insiders as a Missouri limited liability company. FWHC-MO may be served with process through its registered agent Jesse G. Maize, 1008 W. 114th Terrace, Kansas City MO 64114. The attorneys for FWHC-MO consented to and did accept service of the Complaint, however.

34.     The Trustee's claims against FW include unjust enrichment in that FW has retained the benefit of development services provided by GRHC without paying for them.

35.     The Trustee's claims against FWHC-MO include disgorgement of the money it was paid on March 28, 2007, for fraudulently transferring FW membership interests (the 3/28/07 Redemption Agreement provided: $396,737 to FWHC-MO, $242,000 to Berks County, and $854,263 to Free stream Capital). Those funds rightfully belong to GRHC.

36.     The Trustee's claims against FWHC-PA include disgorgement of profits (whether paid previously, now owed or to become due) earned from FW project operation (commercial operation was achieved in 2008) and disgorgement of monies and benefits related to FW including tax credits, depreciation or other tax benefits. as those funds rightfully belong to GRHC.

## Freestream Capital, LLC

37.     Freestream Capital, LLC, ("FreeStream") is a Delaware limited liability company, which served as a financial advisor to GRHC. It may be served with process through its

Registered Agent, Capitol Services, Inc., 615 South Dupont Highway, Dover, DE 19901

Phone: (302)735-9719.

38.     The Trustee's claims against Freestream include disgorgement of the fraudulent transfers made to it by the Insiders on March 28, 2007. Specifically, on that date Edison transferred to Freestream the amount of $854,263 on behalf of FWHC-MO and transferred the amount of $250,000 to Freestream on behalf of LWHC-MO.

### Jurisdiction and Venue

39.     This Complaint arises out of, arises under, and relates to the Chapter 7 bankruptcy proceedings of GRHC now pending in the United States Bankruptcy Court for the District of Kansas, and is property of the bankruptcy estate under 11 U.S.C. §541, and this Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §1334 (b) and (d).

40.     Personal jurisdiction is proper because all of the defendants are residents of the United States, all of the transactions related to these claims occurred in the United States, and all of the defendants maintain offices for the ordinary transaction of business in the United States as provided by *Fed.R.Bankr. P. 7004.*

41.     This Court also has subject matter jurisdiction over the Insiders based on 28 U.S.C. §1331 in that this  Complaint presents a Federal Question. Specifically, this  Complaint pleads a claim under 18 U.S.C. §1962 (Civil RICO) which includes alleged violations of 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud).

42.    In the event Kansas Long Arm Statute controls personal jurisdiction, all defendants are subject to personal jurisdiction in this Court because they: (1) transacted business in the State of Kansas (2) negotiated, entered into and undertook contractual obligations within the State of Kansas (3) breached contractual obligations within the State of Kansas, and/or with a Kansas company; and/or (4) committed tortious acts within the State of Kansas, and/or directed at a Kansas company.

43.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events, acts, errors, omissions, and misrepresentations that give rise to the claims at issue in this case occurred in this District.

44.    The Insider defendants are jointly and severally liable with each other, because the alleged damages constitute a single indivisible harm caused by independent, separate, but concurring wrongful acts of the Insiders.

## GENERAL ALLEGATIONS

45.    On September 23, 1998, the Pennsylvania Utility Commission directed GPU, the owner of two Pennsylvania-based utilities (Metropolitan Edison company and Pennelec), to establish a sustainable energy fund for the purpose of promoting (I) the development of and use of renewable energy and clean energy technologies; (ii) energy conservation and efficiency; (iii) sustainable energy business; and (iv) projects which improve the environment in the GPU service territories, related to GPU's transmission and distribution facilities.

14

46.    As a result of this directive, in 2000 GPU established two separate "Sustainable Energy Funds" (collectively the "SEFs"), with the Metropolitan Edison Sustainable Energy Fund to be administered by two Pennsylvania based philanthropic foundations that serve a number of charitable and public purposes within Pennsylvania (the "Foundations").

47.    On February 8, 2002, the Insiders formed Generation Resources Holding Company, LLC, as a Delaware Limited Liability Company, with its principle offices at 11835 Roe Avenue, #150, Leawood, Kansas. GRHC was to develop and finance special purpose subsidiaries which would be sold to investors, and GRHC was to maintain operational and management control.

48.    On February 26, 2002, GRHC submitted an application (the "February 2002 Loan Application") to the Foundations for a $1,000,000 development loan for the purpose of pursuing the development of wind power projects in Pennsylvania.

49.    In the February 2002 Loan Application, the Insiders represented, among other things, that:

     A.    The Developer will reimburse the Lender in full upon securing construction financing, plus a one-time margin of 20%; The loaned funds to GRHC will be repaid upon securing construction financing of the first project.

     B.    Property agreements (leases) and easements are presently being secured and will be held by GRHC.

     C.    The Developer shall inform the Lender of any material changes in its development plan, schedule or budget within 14 days of making such decision.

     D.    The Developer shall make no cash or equity distributions to its shareholders until it has achieved the Repayment conditions set forth above.

50.    On March 18, 2002 GRHC formed Stonycreek WindPower, LLC as a Delaware company. GRHC was the sole member and owner of Stonycreek Windpower, LLC.

51.    On April 19, 2002, GRHC's February 2002 Loan Application was approved and GRHC and the Foundations entered into an agreement pursuant to which the Foundations made an initial development loan to GRHC in the principal amount of $1,000,000 (the "April 2002 Loan").  The April 2002 Loan proceeds were to be "used that the reasonable discretion of [GRHC] to pay the associated costs and expenses of pursuing and developing financially viable wind-generated projects in Pennsylvania."

52.    On July 22, 2002, GRHC applied for a second "$1,000,000 loan (the "July 2002 Loan Application").   In the July 2002 Loan Application, the Insiders made the following representations, among others:

- The activity or "project" to be undertaken by GRHC for the purpose of the second application would be the development of up to a 45 megawatt renewable energy project located between Hooversville and Central City in Somerset County, Pennsylvania near the village of Forward.

- This project would be known as the Forward Project.

- The second $1,000,000 loan would be repaid in full upon securing construction financing for the Forward Project.

53.    GRHC's July 2002 Loan Application was approved and on or about October 17, 2002.

54.    The October 2002 Loan proceeds were "used at the reasonable discretion of [GRHC] to pay the associated costs and expenses of pursuing and developing financially viable wind-generated power projects in Pennsylvania."

16

55.     The Loans were evidenced by promissory notes dated April 19, 2002 (the "April 2002 Note") and October 17, 2002 (the "October 2002 Note" and collectively, with the April 2002 Note, the "Notes").

56.     The initial maturity date of the April 2002 Note was April 18, 2004, and the initial maturity date of the October 2002 Note was October 17, 2004.

57.     By Allonges to the Notes dated April 8, 2004 (the "Allonges") the maturity dates of the 2002 Notes were extended to mid-December 2005.

58.     From the time the 2002 loans were funded GRHC continued to develop the wind power projects. This included the FW and LW projects long before FW and LW were ever incorporated.

59.     The loans obtained from the Foundations and the services extended by B&V were used to identify and develop all three project opportunities, and the various entities that owned and controlled the project assets derived that ownership and control from illegal, improper and tortious activities described in this  Complaint.

60.     In February 2004 GRHC principles began discussions with Edison Capital, an affiliate of a California based utility conglomerate Edison International, about how to further develop the projects and ultimately sell them to Edison. During this time GRHC was developing the Stonycreek wind farm through GRHC's wholly-owned subsidiary SW. Further, GRHC represented it was working on additional similar projects.

61.     After several months of discussions with Edison, the Insiders learned how Edison would require the projects to be sold – each project would have to be a separate subsidiary that could be sold as an entity. That way the individual leases and permits would not have to be re-written.

62.     Armed with this knowledge from Edison, and on  8/26/04, the Insiders formed FW and named themselves as the sole members and owners. There was no reason to proceed differently with the FW membership than the SW membership, except to set the stage for stripping any redemption payment away from GRHC down the road which was their intent.

63.     On Sept. 7, 2004, the Insiders executed an Operating Agreement stating the purpose of FW was to manage, develop and/or operate renewable resource generation assets. FW's principle place of business was the GRHC offices located at 11835 Roe Avenue, Suite #150, Leawood, KS.

64.     In mid-2004 the Insiders began soliciting another $1 million loan for further development of SW and FW. The Insiders contacted the West Penn Power Sustainable Energy Fund and the Foundations.

65.     The Insiders represented that SW and FW were "subsidiaries" of GRHC, that FW "was in the final stages of development by GRHC of Leawood, KS, through a wholly-owned subsidiary: Forward Windpower, LLC" and that "because of the intertwined nature of the development of both the Stonycreek and Forward Projects" there would be cross-payments/recognition.

18

66.     The Insiders concealed and misrepresented their ownership of FW. For example, in late 2004 the Insiders disseminated through mail and e-mail an Application for Funding requesting a $1 million loan which is demonstrative of what they told the public:

> GRHC is a Delaware corporation formed for the purpose of developing, and potentially owning/operating renewable energy projects. GRHC has secured land and transmission access through its wholly-owned subsidiaries, Stonycreek WindPower, LLC ("Stonycreek") and Forward Windpower LLC ("Forward") for two of the projects it is currently developing within the Commonwealth of Pennsylvania.

> From many discussions it is clear that the organization structure of Generation Resources Holding Company ("GRHC") and its wholly-owned subsidiaries is somewhat confusing to the lay person. To clarify and provide some background to better understand the situation, please read on.

> Each wind development project, Stonycreek and Forward as examples, must be a stand-alone entity that has leases for the land, transmission access for the generation output, and permits that allow the project to occur. In essence, the project must appear independent and stand-alone with no relationship to any other entity so a project investment and the due-diligence by an equity investor can occur without impacting any other project or assuming any liabilities from other projects.

> Counter this axiom that the sharing of costs and resources without "reinventing the wheel" each time leads to lower development costs and more effective utilization of resources. GRHC tries to take advantage of both situations by creating special purpose subsidiaries that are associated with individual projects as shown on the diagram on the following page. This is also the reason the relationship will be with Forward Windpower LLC versus Stonycreek Windpower, LLC since Stonycreek is in the middle of due diligence and should be spun-off in the very near future.

19



**Figure 1**
**Present Organizational Structure**



**Figure 2**
**Organizations After Equity Investment**

67.     The corporate organizational chart provided by the Insiders shows SW, FW and a third company (LW) were the three special purpose subsidiaries being developed by GRHC, and represented that "GRHC has secured land and transmission access through special purpose companies for several of the projects it is currently developing..."

68.     On November 11, 2004, based on the Loan Application, Berks County Community Foundation loaned FW $330,000 to be repaid in one year.

69.     On April 28, 2005, the Insiders formed Lookout Windpower, LLC ("LW"), as a Delaware company, owned and controlled by the Insiders.  The Insiders likewise concealed and misrepresented GRHC's relationship with LW.

70.     On April 28, 2005, the Insiders executed an Operating Agreement stating the purpose of LW was manage, develop and/or operate renewable resource generation assets. LW's principle place of business was the GRHC offices at 11835 Roe Avenue, Suite #150, Leawood, KS.

71.     In June 2005, GRHC and Edison Capital generated a draft memorandum of understanding ("MOU") calling for Edison Capital to acquire from GRHC the right to construct the three Pennsylvania-based wind power projects (Stonycreek, Lookout and Forward) in exchange for additional development loans and the payment of developer fees to GRHC once a "commercial operation date" was achieved.

72.     The MOU represented that GRHC was "the sole developer of the three Pennsylvania-based wind power projects known as Stoney Creek WindPower, Forward WindPower and

Lookout WindPower" which were each "affiliates" of GRHC, and GRHC was to be the

"Managing Member of each Project Company during the development period" and that:

A.      GRHC would own "separate special purpose project companies ... to be
         organized to own all development rights and assets for the projects and will
         take over the completion of the Projects and build, own and operate the
         Projects. All project assets will be assigned to the applicable Project
         Company" and GRHC "will enter into a separate mutually acceptable
         ownership agreement in relation to each Project Company..."

B.      "This memorandum is intended as an outline only and does not address all of
         the terms, conditions, covenants, representations, warranties and other
         provisions which would be contained I definitive documentation referenced
         herein."

C.      In addition to being paid the Sunk Costs GRHC as the Developer was entitled
         to be paid the Developer Fees which were estimated to be $70 million less
         costs[2] for the Lookout and Forward Projects – the net payment (meaning pure
         profit) agreed upon in the March 28, 2007, Redemption Agreements for the
         LW and FW Project Companies was $13 million.

73.     The Insiders induced credit extensions based on concealment and misrepresentations

of the ownership of LW and FW by mailing and/or e-mailing draft MOU versions through

June and July 2005 culminating in the final MOU between GRHC and Edison dated July 18,

2005, and which in addition to the aforementioned states in part:

---

[2] As of 12/14/2005 GRHC was representing on its web site that it was the owner and
developer of all three Project Companies. It states that the estimated cost for FW was $54M.
Because the Insiders manipulated the allocation of Sunk Costs between the Project Companies
(weighting heavily to Stony Creek and next to FW), the Sunk Costs for Lookout Project were
"none."

Re:     Memorandum of Understanding Relating to the Development
        of the 65 MW Stonycreek Wind Power Project, the 30 MW Forward Wind Power
        Project, and the 25 MW Lookout Wind Power Project in Pennsylvania

Ladies and Gentlemen:

This Memorandum of Understanding (this "Memorandum") is entered into between Edison Capital ("EC") and Generation Resources Holding Company LLC ("Developer" and collectively with EC, the "Parties" and individually, each a "Party"), as of the date written above. The purpose of this Memorandum is to describe the general terms of a transaction (the "Transaction") under which EC (or an affiliate or designee of EC) and Developer shall pursue the continuing development of (i) a proposed 65 megawatt ("MW") nameplate rated wind power electric wholesale generation project to be located on a site currently leased by Stonycreek Windpower, LLC, an affiliate of Developer, located in Somerset County, Pennsylvania (the "Stonycreek Project"), (ii) a proposed circa 30 MW nameplate rated wind power electric wholesale generation project to be located on a site currently leased by Forward Windpower, LLC, an affiliate of Developer, in Somerset County Pennsylvania (the "Forward Project"), and (iii) a proposed circa 25 MW nameplate rated wind power electric wholesale generation project to be located on a site currently leased by Lookout Windpower, LLC, an affiliate of Developer, in Somerset County Pennsylvania (the "Lookout Project" and, collectively with the Stonycreek Project and the Forward Project, the "Projects"). This Memorandum is intended as an outline only and does not address all of the terms, conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation referenced herein.

74.     The July 18, 2005 final MOU was not e-mailed to the Foundations until October 27, 2005, but was essentially the same as the June 15, 2005, draft version which the Foundations relied on in fulfilling the Insiders' request to approve the MOU terms.

75.     The transaction whereby Edison/Mission would acquire the three projects became known as the "Stonycreek Deal."

76.     Additional representations in the Stonycreek Deal MOU showing GRHC was the true Developer include:

        A.      "Developer is actively developing the Projects as each is more fully described on Appendix A hereto." Appendix A specifically names and describes each of the three Projects (SW, FW and LW) on separate pages.

23

B.   Edison promised GRHC that it would "work together on an exclusive basis after an initial review and completion of preliminary diligence by EC to pursue the continuing development of the Projects."

C.   Sunk Costs used for "evaluation and pre-development of the Projects are approximately $4.7 million."

D.   "The Parties [defined as EC and GRHC] will enter into a separate mutually acceptable ownership agreement (the "Operating Agreement") in relation to each Project Company pursuant to which each Project Company will be created and which will include, without limitation, the following terms:

   1.   Prior to closing of construction financing, Developer shall own 50% of the Project Company, and EC shall own 50% of the Project Company for a nominal investment.

   2.   Developer or its designee shall be the managing member of the Project Company during the Development Period.***

   3.   The Parties [defined as EC and GRHC] will develop the Projects through the Project Companies..."

E.   "Developer Fees: In addition to reimbursement of the Sunk Costs as noted above, Developer shall be entitled to the fees set forth in the Development Agreement, including:

   COD Fee:   Payable upon achievement of commercial operations date..

   SEF Loans:   Payments will be made to [SEF Loans and B&V] from proceeds otherwise attributable to the COD Fee prior to any payment being made to the Developer in the manner described in such note in favor of Black & Veatch Corporation."

77.   Edison and GRHC prepared several Stonycreek Deal draft Development Agreements that mimic the terms of the MOU and show the same thing - that GRHC developed the projects, was the named Developer and was to get the proceeds from the sale of the wind farms.

78.     On July 18, 2005, Stonycreek Deal MOU was executed and copies provided to the Foundations and Black & Veatch.

79.     GRHC continued to develop the Project Companies, and definitive documents contemplated by the MOU were prepared by Edison.

80.     On August 23, 2005, first drafts of the Development Agreement and Development Loan Agreement for all three Project Companies were circulated by Edison.

81.     The draft Development Agreement provided that GRHC was the "Developer" and was entitled to the Developer Fees, was the owner of the Project Companies and would be required to transfer that ownership upon payment of the Developer Fees, and otherwise contains numerous recitals confirming GRHC is the owner and developer of the projects.

82.     The Development Loan Agreement provided that GRHC was the Borrower of funds related to the Project Companies Borrower was developing.

83.     The initial draft Development Agreements and Development Loan Agreement were consistent with the July 18, 2005, MOU and were sent to the Foundations.

84.     On August 29, 2005, GRHC's Financial Advisor, defendant Freestream, returned the Insiders' edits to the Development Agreement and Development Loan Agreement. All the edits were again consistent with GRHC being the Developer and Borrower for each of the Project Companies, and being paid the sales price.

85.     Unless the three Project Companies were considered assets of GRHC, as of November 28, 2005, GRHC was insolvent.

86.     On November 28, 2005, the Insiders created FWHC-PA and LWHC-PA. The Insiders established themselves as the sole owners of those holding companies but did not disclose that to the Foundations or Black & Veatch.

87.     The Insiders represented to Edison that the Foundation and B&V debts would be paid in full as part of the overall Stonycreek Deal.

88.     On Dec. 1, 2005, revised Development Agreement drafts were circulated among the Insiders. The revisions split the Agreements into three separate Development Agreements instead of one Development Agreement, and changed the named Developer for the Lookout and Forward Projects to LWHC-PA and FWHC-PA instead of GRHC.

89.     On December 14, 2005, the Insiders were representing on the GRHC website that GRHC was the developer of all three Pennsylvania wind Projects.

90.     Edison required GRHC to obtain an extension of the Foundation loan maturity dates and the Black & Veatch note as a condition to executing the LW and FW Development Agreements, the Development Loan Agreement, and other definitive agreements.

91.     The Insiders induced the Foundations to extend their Loans by telling the Foundations their Loans could not be repaid unless GRHC "entered into an arrangement with Edison Capital and EHI.....pursuant to which Edison would provide financing for further development of the Projects."

92.     The Insiders provided the Foundations the following documents in an effort to mislead the Foundations into believing that GRHC was the developer:

A.   The Development Agreement for SW which named GRHC as the developer – this induced the Foundations to think that GRHC was likewise the developer on the other two project development agreements but it was not;

B.   The Development Loan Agreement which listed all three Project Companies as the Borrowers – this was the only one of the Stonycreek Deal documents that listed all three Project Companies together;

C.   An Amended Operating Agreement for SW which showed GRHC as the Developer.

93.   By letter agreement dated January 6, 2006, and still not having been told the July 18, 2005, MOU deal had been altered, the Foundations agreed to extend the maturity date of the Loans to December 31, 2007.

94.   On January 19, 2006, Insider Robert Gardner formed the Gardner Family Investment Company, LLC, as a Missouri Limited Liability Company. Defendants Robert and Robin Gardner own and control this LLC. Upon information and belief, these Insider defendants transferred some or all of their ownership in the various entities related to the GRHC Project Companies to this Family Investment Company.

95.   On January 19, 2006, Insider formed the Stevens Family Investment Company, LLC, as a Missouri Limited Liability Company. Defendants William and Akiko Stevens own and control this LLC. Upon information and belief, these Insider defendants transferred some or all of their ownership in the various entities related to the GRHC Project Companies to this Family Investment Company.

96.   Upon information and belief, on or about January 19, 2006, defendants R. James Ansell and Virginia Ansell formed an LLC to hold their interest in the various entities related

27

to GRHC. Upon information and belief, these Insider defendants transferred some or all of their ownership in the various entities related to the GRHC Project Companies to this LLC or similar entity whose name is presently unknown to the Trustee.

97.     For LWHC-PA to have the authority to execute an Amended and Restated Operating Agreement for LW on the target closing date for the Stonycreek Deal (February 3, 2006) LWHC-PA must have been a member of LW owning membership interests.

98.     For that to occur the Insiders were required to transfer their membership interests in LW to LWHC-PA before February 3, 2006.

99.     Section 8.2 of the original (4/28/05) LW Operating Agreement required that Any transfer of LW membership interests be in writing and approved by all LW members.

100.    There are no documents or instruments purporting to transfer the Insiders membership interests in LW to LWHC-PA or to anyone else.

101.    Any purported transfer of LW membership interests by any entity (i.e. LWHC-PA) who did not own said membership interests was void.

102.    For FWHC-PA to have the authority to execute an Amended and Restated Operating Agreement for FW on February 3, 2006 purporting to transfer 50% of FW to Edison, FWHC-PA must have been a member of FW owning membership interests.

103.    For that to occur the Insiders were required to transfer their membership interests in FW to FWHC-PA before February 3, 2006.

104. Any transfer of FW membership interests was required to be in writing and approved by all FW members.

105. There are no documents or instruments purporting to transfer the Insiders' membership interests in FW to FWHC-PA or to anyone else.

106. Any purported transfer of FW membership interests by any entity (i.e., FWHC-PA) who did not own said membership interests was void.

107. GRHC provided the assets, resources, ISP and offices for the LW and FW projects to be developed and identified and created the opportunity to develop and sell them to Edison.

108. On January 27, 2006, Black & Vetch amended its July 18, 2005, note to extend the due dates. The Insiders induced Black & Veatch to extend the due dates of GRHC's debt to it by telling Black & Veatch that its invoices could not be repaid unless GRHC closed the Stonycreek Deal with Edison.

109. On February 3, 2006, after the Insiders caused the "switch" in the identity of the "Developer" from GRHC to LWHC-PA and FWHC-PA, the secretly restructured "Stonycreek Deal" with Edison closed. The gist of this Deal was:

    A.    induce a development loan to continue further development by agreeing to transfer 50% ownership in each project to Mission Wind,

    B.    obtain construction financing and management in the event the Projects became capable of commencing construction (this happened 3/28/2007 and coincided with transferring the remaining 50% ownership to Mission Wind and agreeing on a Redemption formula), and

C.    establish a redemption formula to be paid when the Projects reached commercial operation.

110. The Stonycreek Deal included the following components, most of which are legally invalid presumably because all the shell companies were viewed as culminating in GRHC who could ratify any irregularities across the board:

A.    <u>Lookout Amended Operating Agreement</u>: Mission Wind and LWHC-PA executed a document titled Amended and Restated LLC Operating Agreement for Lookout Windpower, LLC, which claims to "amend and restate that certain Operating Agreement on the Company [LW] dated April 28, 2005..."

     (I)    The original LW Operating Agreement names the Insiders individually as the members, managers and officers of LW, and requires any transfer of LW membership be in writing.

     (ii)    There is no writing transferring the Insiders' membership interests in LW to LWHC-PA.

     (iii)    Therefore, neither party to the 2/3/2006 Amended and Restated LLC Operating Agreement for Lookout Windpower, LLC, had any authority to amend the original April 28, 2005 Operating Agreement.

B.    <u>Forward Amended Operating Agreement</u>: Mission Wind and FWHC-PA executed a document titled Amended and Restated LLC Operating Agreement for Forward Windpower, LLC, which claims to "amend and restate that certain Operating Agreement on the Company [FW] dated September 7, 2004, ..."

     (I)    The original FW Operating Agreement names the Insiders individually as the members, managers and officers of FW, and requires any subsequent transfer of FW membership be in writing.

     (ii)    There is no writing transferring the Insiders' membership interests in FW.

     (iii)    Therefore, neither party to the 2/3/2006 Amended and Restated LLC Operating Agreement for Forward Windpower, LLC, had any authority to amend the original September 7, 2004, Operating Agreement.

C.   <u>Stonycreek Amended Operating Agreement</u>: Mission Wind and GRHC executed a document titled Amended and Restated LLC Operating Agreement for Stonycreek Windpower, LLC, which claims to "amend and restate that certain Operating Agreement on the Company [SW] dated March 18, 2002 ..." William Stevens executed this document as a "member" of GRHC.

D.   <u>Development Loan Agreement</u>: Edison ("Lender") and SW, LW and FW (collectively "Borrower") executed a document called Development Loan Agreement.

   (I)   Insider William Stevens executed this document as a "member" of SW; however, the original Operating Agreement for SW dated March 12, 2002[3], provides the GRHC is the only member of SW and that any transfer of that membership must be in writing. There is no such transfer and no such writing.

   (ii)   Insider William Stevens executed this document as a "member" of LW which contradicts the Insiders' claim that as of 1-23-2006 LWHC-PA owned 100% of LW and was its sole member.

   (iii)   Insider William Stevens executed this document as a "member" of FW which contradicts the Insiders' claim that as of 1-23-2006 FWHC-PA owned 100% of FW.

   (iv)   Part of the Development Loan was used for development of the SW project. At the time of Redemption, and in order to even reach a redemption agreement, FW and LW agreed to and did pay the Development Loan advances attributable to SW. FW and LW resources should likewise be used to satisfy the Foundation Loans and B&V note.

E.   <u>Lookout Development Agreement</u>: LWHC-PA and LW executed a Development Agreement. William Stevens signed as a "member" of LW, and as a "member" of LWHC-PA. Signing as a "member" of LW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 LWHC-PA owned 100% of LW.

---

[3] The Amended and Restated Operating Agreement for Stonycreek claims to amend the original Operating Agreement dated March 12, 2002. However, Stonycreek Windpower, LLC was not created until March 18, 2002.

F.  Forward Development Agreement: FWHC-PA and FW executed a Development Agreement. William Stevens signed as a "member" of FW, and as a "member" of FWHC-PA. Signing as a "member" of FW on 2/3/2006 contradicts the Insiders' claim that as of 1-23-2006 FWHC-PA owned 100% of FW.

G.  Stonycreek Development Agreement: GRHC and SW executed a document titled Development Agreement.

H.  Secured Promissory Note: SW, FW and LW signed a note borrowing $850,000 from Edison (EHI Development Fund) for use in development of the three projects.

   (I)    The Note provides joint liability and each of the Project Companies was 100% liable for 100% of the funds advanced regardless of which Project used the money. This again shows the belief that GRHC owned and controlled all three Project Companies.

   (ii)   William Stevens signed as a "member" of FW. Signing as a "member" of FW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 FWHC-PA owned 100% of FW.

   (iii)  William Stevens signed as a "member" of LW. Signing as a "member" of LW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 LWHC-PA owned 100% of LW.

I.  Security Agreement: SW, FW and LW signed a Security Agreement cross-collateralizing the debts of all Project Companies with "all of Grantor's right title and interest in and to all of the personal property of Grantor.. now or hereafter existing, tangible or intangible, whether now owned or hereafter acquired..." This meant all of SW's property could be foreclosed to pay development expenses used on LW and/or FW which again shows the status of GRHC as the Developer in control of all three Project Companies.

   (I)    The Security Agreement provides joint liability and all of the past, present and future assets of each Project Company was pledged as collateral for all of the funds advanced regardless of which Project used the money.

(ii)    William Stevens signed as a "member" of FW. Signing as a "member" of FW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 FWHC-PA owned 100% of FW.

(iii)    William Stevens signed as a "member" of LW. Signing as a "member" of LW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 LWHC-PA owned 100% of LW.

J.    <u>Non-Recourse Pledge Agreement</u>: GRHC, LWHC-PA and FWHC-PA entered this for the purpose of promising Edison that if any of the Project Companies defaulted on their Development Loan, Edison could foreclose on the membership interests related to each of the Project Companies. This meant GRHC's membership interests in SW could be foreclosed if LW and/or FW did not repay development expenses used on LW and/or FW. This again shows the status of GRHC as the Developer in control of all three Project Companies.

(I)    The Non-Recourse Pledge Agreement provides: "It is a condition precedent to the initial extensions of credit by Lender under the Loan Agreement that Pledgor [GRHC, LWHC-PA and FWHC-PA] shall have granted the security interests and undertaken the obligations contemplated by this Agreement." In other words, if GRHC did not agree to pledge its ownership interest in SW, then the Stonycreek Deal would not close and the LW and FW projects would not proceed.

(ii)    Any notice clause states "For the purposes hereof, the address of each party hereto shall be as set forth under such party's name on the signature pages hereof..." The notice address for FWHC-PA and LWHC-PA states: "c/o Generation Resources Holding Company."

K.    <u>Assignment of Project Documents</u>: SW, FW and LW were each required to sign this Agreement or the Stonycreek Deal would not close and the LW and FW projects would not be funded. Its purpose was to assign the leases and other property rights each Project Company established with landowners where the project would be constructed.

(I)    This agreement was "additional collateral" under the Loan Agreement, Note and other documents. This Agreement cross-collateralized the debts of all Project Companies meaning that all of SW's interests in the leases could be foreclosed to pay development expenses used on LW and/or FW. This again shows the status of GRHC as the Developer in

control of all three Project Companies.

(ii)     William Stevens signed as a "member" of FW. Signing as a "member" of FW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 FWHC-PA owned 100% of FW.

(iii)    William Stevens signed as a "member" of LW. Signing as a "member" of LW on 2/3/2006 contradicts the Insiders' claim that as of 1/23/2006 LWHC-PA owned 100% of LW.

(iv)    Numerous leases for property upon with the LW and/or FW projects exist were executed by GRHC Officers before FW and/or LW were even formed, again showing GRHC was the developer of the Projects.

111.   The putative Amended and Restated Operating Agreements for each of the three Project Companies provide that 50% of each Project Company would be transferred to Edison upon execution of the Amended and Restated Operating Agreements and the remaining 50% would be transferred upon commencement of Construction and execution of a Redemption Agreement (this occurred 3/28/2007).

112.   The Redemption Price was to be paid in two installments - the first installment upon "commencement of Construction" and the second installment upon "Commercial Operation."

113.   Specifically, paragraph 12.2 of the Amended and Restated Operating Agreements for LW provides:

Mandatory Redemption.  Upon the Commencement of Construction, [Lookout WindPower] shall redeem, retire and take delivery of all Membership Interests then owned by [Lookout Holding]. [Lookout WindPower] agrees to put, sell, assign, transfer, convey and deliver to [Lookout WindPower] all Membership Interests then owned by [Lookout Holding] in consideration for receipt of the amount calculated in accordance with the formula set forth in Exhibit F hereto (the "Redemption Price") from the Company.  The Redemption Price shall be paid by [Lookout WindPower] to [Lookout Holding] or its designee(s) in cash

in two installments as set forth in <u>Exhibit F</u>.  Upon the indefeasible payment of the Redemption Price, the Percentage Interests of the Members shall automatically change from those percentages set forth in <u>Section 5.4(a)</u> to those set forth in <u>Section 5.4(b)</u> and, without further action on the part of either party, [Lookout Holding] shall be deemed to have withdrawn from, and will automatically cease to be a Member of, [Lookout WindPower] and shall have no further rights or obligations under this Agreement.

114.   As stated in Paragraph 12.2, LWHC-PA was to transfer its remaining 50% ownership in LW to Mission Wind in exchange for the "Redemption Price" upon commencement of construction of the Project. The same was true with FWHC-PA and FW.

115.   After the Mandatory Redemption, as defined in Paragraph 12.2, Mission Wind would hold 100% of the interest in Lookout WindPower and in Forward Windpower.

116.   After February 3, 2006, Mission Wind transferred 50% of its 50% ownership in LW and FW to Mission Wind Two and 50% to Mission Wind Three. Upon information and belief, Mission Wind Two and Mission Wind Three remain the successor interest holders.

116.   Exhibit F to the Amended Operating Agreements (the "Redemption Formula Spreadsheet") sets out the formula for determining the Redemption Price.  The Redemption Formula Spreadsheet stated, "The Redemption Price shall be: I) The Project Base Case Valuation, less ii) Sunk Costs, less iii) Mandatory Loan Prepayments."

117.   The Redemption Formula Spreadsheet defined, "The Project Base Valuation" as "the net present value of the unleveraged, after-tax cash flows (including Production Tax Credits) as of the Commencement of Construction and based on the Pro Forma attached hereto as Exhibit F-1, which Pro Forma shall assume an internal rate of return on [Mission Wind's]

Interest of 9.5% for Lookout."

118.   The Redemption Formula Spreadsheet defined, "Sunk costs" as "the amounts set forth in Exhibit A of the Development Agreement. Those amounts were to be paid at the time of Commencement of Construction and are:

A.   SW: $2.5 million in combined loans to Berks County Foundation ($and Black & Veatch (BV 7/18/05 note is for $2.2M);

B.   FW: $1,250,000 less the First Installment paid FW upon Commencement of Construction to be used to pay the Foundation loans (which totaled about $2.5 million);

C.   LW:   None.

119.   The Insiders manipulated the three Project Companies to force as much debt as possible on SW because the Insiders recognized that SW was the smallest project and had the worst wind resource and was probably not going to hit the 9.75% return rate neede4d to commence construction.

120.   The Redemption Formula Spreadsheet defined "Mandatory Loan Prepayments" as "the amounts referenced in Section 2.7(b) and (c) of the Development Loan Agreement ("Mandatory Loan Prepayments")."

121.   As provided in the Redemption Formula Spreadsheet, between the date of the Amended Operating Agreement and "the Commencement of Construction, the parties agree to periodically update the assumptions, calculations and methodology contained in the financial model attached hereto as Exhibit F-1, as appropriate, based on any new information as it becomes available."

36

122.    Over the next twelve months, Mission Wind and Edison caused monies to be loaned to LW and FW to fund the Project in accordance with a pre-agreed budget and schedule.

123.    On or about December of 2006, the LW Project was fully permitted and was ready for "Commencement of Construction."

124.    During this time the parties gathered bids for the anticipated costs related to the construction of the Project to use in the Redemption Formula Spreadsheet.

125.    Additionally, the parties gathered information regarding potential revenue to determine the "net present value of the unleveraged, after-tax cash flows" to use in the Redemption Formula Spreadsheet.

126.    During this same time period, the parties obtained a Power Purchase Agreement from Washington Sewer District in St. Louis, Missouri to purchase wind generated electric power at the price of $64.00 per megawatt hour.

127.    Edison did not pursue the SW project and by the end of 2006 at the latest the Insiders knew the Stonycreek project (as the smallest size and with the worst wind resources) was not financially viable (it needed to project a 9.75% return before construction would commence).

129.    The Insiders knew that without the LW and FW Redemption payments GRHC had no way to pay the Foundation Loans or B&V and would have to eventually file bankruptcy.

130.    On 12/1/2006 the Insiders formed FWHC-MO and LWHC-MO. At some undocumented time before the March 28, 2007, Redemption closing the Insiders purportedly transferred all LW membership interests held by LWHC-PA to LWHC-MO.

131.    The 2/3/2006 LW Amended Operating Agreement and the 2/3/2006 Non-Recourse Pledge Agreement required the written consent of Edison to any such transfer. No such consent was requested or granted and any such transfer of LW membership interests is invalid.

132.    The 2/3/2006 FW Amended Operating Agreement and the 2/3/2006 Non-Recourse Pledge Agreement required the written consent of Edison to any such transfer. No such consent was requested or granted and any such transfer of FW membership interests is invalid.

133.    According to the July 18, 2005 MOU, the Sunk Costs were about $4.7 million for all projects. The Stonycreek Deal MOU considered the projects as all being developed by GRHC as a single entity and, therefore, looked at Sunk Costs collectively.

134.    In the first quarter of 2007 the Insiders reached a tentative agreement with Edison to sell the FW and LW projects for $13 million.

135.    The Insiders told Edison to allocate all the expenses to FW and all the profits/fees to LW, to wit:

| | |
|---|---|
| FW Sunk Costs: | $1,493,000 |
| FW Developer Fees: | None. |
| LW Sunk Costs: | None. |
| LW Developer Fees: | $11,507,000 |

136.    On March 5, 2007, the Insiders and Edison exchanged numerous e-mails that solidified Edison would pay $13 million for LW and FW *provided* there was an agreement that GRHC not be paid a development fee on top of the Sunk Costs for Stonycreek if and

when Edison decided to commence construction of the SW facility.

137.    The agreement was made through the following e-mail exchanges:

Edison (11:12 AM): Just to update you on status. We have not wired and do not yet have authority to wire funds for the Lookout Facility Study to PJM. To make sure you understand our intentions, we are still anticipating closing along the lines that we've previously agreed upon. Based on this process we calculate value for the Lookout project at $11.05 million. The sunk costs for Forward are $1.493 million for a combined total of $12.543 million - with $2.593 paid up-front (Forward sunk costs and $1 million for Lookout) the remainder would be paid at COD. Please let me know when/if you would like to discuss.

GRHC (1:04): As we discussed, we agree to settle for a total of 13 million, Forward will be for $1.493 sunk costs, paid now. Lookout will be for $1 million now and the balance at COD. The documents are to be as we discussed on the conference call with Larry. I understand that you are funding the Lookout FSA in reliance upon the settlement. I'm leaving now for the airport and will talk to you later for the details.

GRHC (1:09): Sorry I forgot to add this to the last e-mail. I do not have the authority to agree to Stonycreek going for the sunk costs; however we will cooperate fully in getting the authorization from the SEFs and Black & Veatch to that result.

Edison (1:26): Thanks Bob, Just to clarify, we have an agreement that GRHC will not require further development fee on top of the Sunk Costs for Stonycreek already identified in the documentation. GRHC will assign the project to Edison when Edison is ready to commence construction. We understand that this agreement to assign the project to Edison may require the consents of SEF and/or Black & Veatch. Further, GRHC will be responsible for those consents.

Edison (1:32): Thanks Bob, In reliance on this and the follow up note on Stonycreek, I am wiring the funds to PJM. We will seek final Edison senior management approval asap and also be following up on the formal documents shortly.

138.   On March 4, 2007, GRHC e-mailed a financial model to Edison with LW Redemption

Price calculations, and Edison replied with adjustments the next day.

139.   Edison also e-mailed GRHC a draft Redemption Agreement, among other things,

provided for a single Redemption Price, to wit:

> Redemption Price. Notwithstanding anything to the contrary in either of the
> Operating Agreements, the Redemption Price for the Developer Members'
> entire respective rights and interests as members in Lookout and Forward or
> otherwise arising under either of the Operating Agreements and/or the
> Development Agreements shall be a fixed amount not to exceed $13,000,000
> (the "Revised Redemption Price") which the parties hereto agree shall be
> allocated $1,493,000 to the Forward redemption and $11,507,000 to the
> Lookout redemption.

140.   The draft required both FW and LW to warrant that all monies owed to the

Foundations were paid in full, and all Sunk Costs (which included Black & Veatch) were

paid in full:

> Developer Members each represent and warrant that there are no other
> obligations owed by either Forward or Lookout to (A) Berks County
> Community Foundation and Community Foundation of the Alleghenies, (B)
> third party payees as Sunk Costs, if any, and (C) Freestream or to any other
> person or entity other than EHI Development Fund.

141.   The Insiders persuaded Edison to remove such promises from the LW final

Redemption Agreement.

142.   The Edison draft Redemption Agreement conditioned payment of the Final

Installment upon Commercial Operation of both projects, to wit:

> (d) A payment of $11,507,000 ("COD Payment") shall be paid within five
> business days after the earlier of (I) the date both of the Projects have achieved
> Commercial Operation, or (ii) December 31, 2007...

143.   The Insiders persuaded Edison to remove that condition from the final Redemption Agreements.

144.   The Insiders persuaded Edison to split the draft into separate agreements for FW and LW. However, because Edison viewed the three projects as one development by GRHC (hence the name "Stonycreek Deal"), Edison required the final LW Redemption Agreement to be reduced by the money Edison paid FW for its redemption Price (which was really just the Sunk Costs, i.e., all Developer Fees were pushed into the LW Redemption Price) if the FW project faltered. The *Lookout* Redemption Agreement provides:

> In addition to the foregoing, if the permits necessary for the Forward Project Substation parcel (which is the subject of a separate agreement involving Investor Member and an affiliate of Developer Member) are not obtained, then the Final Installment shall be reduced by $1,493,000. Developer Member represents and warrants that there are no other obligations owed by Forward to (A) Freestream Capital LLC or (B) any other person or entity other than EHI Development fund...

145.   This was done partially because LW had zero Sunk Costs due to LW development expenses being allocated by the Insiders to SW and/or FW.

146.   The Insiders told Edison to distribute the Redemption Price as follows:

Payments from FW Allocation of $1,493,000:
$396,737     1st Installment paid to FWHC-MO (the Insiders)

$242,000     1st Installment paid to Berks Foundation on behalf of Forward (provided for in 12.2 of Amended Operating Agreement – relates to the 11/11/2004 Loan to FW)

$854,263     1st Installment paid to FreeStream on behalf of FW

Payments from LW Allocation of $11,507,000

$750,000      1st Installment paid to LWHC-MO (the Insiders)

$250,000      1st Installment paid to FreeStream on behalf of LW

$10,507,000   Final Installment to be paid to LWHC-MO (the Insiders - 75%), and
              Freestream (25%)

$13,000,000.  TOTAL

147.   The Redemption Price distributions improperly manipulated the payment to Freestream too. Freestream was to receive 25% of the sales price of each project but in order to strip FW of all potential to fully repay even the 11/11/2004 loan, the Insiders allocated most the Freestream payment to FW.

148.   On March 28, 2007, LWHC-MO and Mission Wind entered into a written Redemption Agreement wherein Mission Wind agreed to pay and LWHC-MO agreed to accept $11,507,000 for the LW Redemption Price, allocated as indicated above.

149.   On March 28, 2007, FWHC-MO and Mission Wind entered into a written Redemption Agreement wherein Mission Wind agreed to pay and FWHC-MO agreed to accept $1,493,000 for the FW Redemption Price, allocated as indicated above.

150.   There is no document or instrument transferring LW membership interests to LWHC-MO or to FWHC-MO. Therefore, any attempt by LWHC-MO and/or FWHC-MO to transfer membership interests in LW or FW by executing a Redemption Agreement or otherwise is void. The same is true with regard to LWHC-PA and FWHC-PA.

151.   On March 28, 2007, LWHC-MO and Mission Wind entered into a Security Agreement whereby Mission Wind assigned and pledged a first priority security interest in the membership interests it claimed to hold in LW and agreed that LWHC-MO may exercise all rights and remedies of a secured party on default under the UCC, including, but not limited to, the sale of the membership interest.

152.   The collateral pledged to LWHC-MO under the Security Agreement, the interest in the membership interests held by LW, was subsequently transferred to Mission Wind Two and Mission Wind Three.  Thus, Mission Wind Two and Mission Wind Three now hold the collateral pledged by Mission Wind to LWHC-MO.

153.   On March 28, 2007, the FW Redemption Agreement was signed and the $1,493.000 Redemption Price as allocated by the Insiders was paid by transferring $396,737 to FWHC-MO (for the Insiders), $242,000 to Berks Foundation on behalf of Forward, and $854,263 to Freestream on behalf of FW.

154.   On March 28, 2007, the First Installment ($1,000,000) of the LW Redemption Price was paid on March 28, 2007, at the time the LW Redemption Agreement was signed. The balance of $10,507,000 was to be paid within five business days of the LW Project achieving "Commercial Operation."  The $1,000,000 was paid by Edison on behalf of Mission Wind, as follows: $750,000 to LWHC-MO (i.e., the Insiders personally) and $250,000 to FreeStream.

43

155.   On 12/31/07 the Foundation Loans became due (the original due date having been extended on 1/6/06 to accommodate the Stonycreek Deal).

156.   On March 11, 2008, the Foundations sued GRHC for $2.625 million, judgment was entered and execution commenced 3/24/08.

157.   Despite knowing GRHC was insolvent without the LW redemption payment, and despite planning to keep that payment for themselves, and despite knowing GRHC had no other revenue opportunities, the Insiders delayed placing GRHC in bankruptcy for over a year (not until 4/28/08).

158.   The Insiders wanted to collect the Final Installment (due upon commercial operation - projected Spring/Summer 2008) first, but due to certain delays that was not achieved until September 12, 2008, and in no event later that October 20, 2008.

159.   On or about September 22, 2008, LWHC-MO sent a default notice and demand for payment of the Final Installment to Mission Wind and Edison.

160.   On or about September 25, 2008, LW responded to the demand stating that "We wish to advise you that Commercial Operation of the Project has not occurred yet.  The majority of the turbines at the Project are still in the commissioning and testing phase with the turbine manufacturer and this work is not expected to be completed before Friday, October 3, 2008."

161.   On or about November 10, 2008, LWHC-MO sent demand for the Final Installment.

162.   On or about November 10, 2008, LW responded and acknowledged the LW Project had reached Commercial Operation but  stated it was reducing the Final Installment from

$10,507,000 to $5,514,460.30 due to delays in the construction scheduled, specifications and increased construction costs primarily attributable to LWHC-MO.

163.   At no time prior to the November 10th Letter had LW ever alleged any delays attributable to the Developer.

164.   The delays and expenses recited in LW's 11/10/2008 letter are not primarily the responsibility of Developer.

165.   On or about December 5, 2008, LW provided an additional response to LWHC-MO's requests for information and again acknowledged that the LW Project had reached Commercial Operation but that it was still reducing the Final Installment from $10,507,000 to $5,688,435.97.

166.   Accordingly, LW admitted owing in excess of $5.6 million.

167.   In the 12/5/2008 letter from LW stated:

> Developer and Lookout expressly agreed in paragraph 3 of the Redemption Agreement that the Developer Fee would be reduced to the extent that (1) Lookout incurs costs for acquiring additional land for a substation and (2) the final price or cost establish under the SREC Letter Agreement is higher than initially budgeted for in the original Lookout [WindPower] budget.  The attached Exhibit A is a breakdown of all the costs incurred by Lookout [WindPower] that are directly attributable to the circumstances described in clauses (10 ans (2) above.  Further, the Redemption Agreement states that the Developer Fee shall also be reduced to the extend [Lookout Holding] is primarily responsible for the project not being completed in accordance with the construction schedule, specifications and construction costs set forth herein.  The Developer Member is primarily responsible for additional costs described herein because it negotiated and signed the "actual costs" SREC Letter Agreement without negotiating any limits on the cost of construction or any penalties for construction delays.

168.   Attached to the 12/5/2008 letter, LW itemized the alleged delays "primarily attributable" to the Developer.

169.   The delays and expense allocated to Developer in LW's 12/5/2008 letter are not primarily the responsibility of the Developer.

170.   On April 8, 2009, the Trustee's attorneys sent a demand for payment of the Final Installment to the attorneys for LW/Edison/Mission but to date neither Lookout WindPower, Mission Wind, and/or Edison have paid the Final Installment, which is now due and owing.

171.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

172.   From its inception on February 8, 2002, and at all times thereafter each of the Insiders was a member of GRHC which was member-managed. Messrs. Ansel, Gardner and Adams were also officers. As such, at all times stated herein, there was a fiduciary relationship between GRHC and each Insider.

173.   GRHC had a business interest, expectancy and opportunity in developing the LW and FW projects and receiving the proceeds of the sale and/or operation of those projects.

174.   GRHC had the resources and ability to take advantage of those interests, expectations and opportunities, and to own, manage, operate and/or sell the LW and FW projects.

175.   The LW and FW projects were the only material assets that GRHC had/has from which to pay its creditors.

176.   The Insiders breached their duties to GRHC, were negligent and acted in an unfair

manner towards GRHC in the above described instances including without limitation:

A.   They undercapitalized GRHC, and caused it to become insolvent and file bankruptcy, in part by causing GRHC to incur debt that could only be repaid by successful sale and/or operation of all three wind farm projects said debt was used to develop but then deprived GRHC of that opportunity and expectation;

B.   They operated GRHC while insolvent but did not take steps to recover from or lessen the insolvency (just the opposite) even though they had that opportunity and ability;

C.   They diverted GRHC resources to third parties, including without limitation LW and FW without even attempting to recoup those costs or a return on that investment;

D.   They gave up GRHC rights in order to continue and to close the FW and LW projects and keep those proceeds for themselves, including without limitation giving up any fee for the SW project in order to close the FW and LW Redemption Agreements which benefitted them personally;

E.   They encumbered and used GRHC assets to continue and close the LW and FW projects without obtaining any benefits to GRHC even though they knew that the Stonycreek Deal would not and could not proceed without GRHC making such concessions and agreements, including without limitation execution of the Promissory Note, Security Agreement, and Non-Recourse Pledge Agreement.

F.   They usurped corporate opportunities, including without limitation naming themselves the owners of LW, FW, LWHC-(PA and MO), and FWHC-(PA and MO);

G.   They used information, experience, knowledge, e-mail and other tangible and intangible assets owned and/or developed by GRHC to create and develop LW, FW, LWHC-(PA and MO), and FWHC-(PA and MO) and then manipulated those entities to strip away from GRHC the expectation and opportunity of development, repayment and return;

47

H.      They secretly switched the name of the Developer on the Stonycreek Deal
        documents and again on the Redemption Agreement documents from GRHC
        to entities owned and controlled by the Insiders personally for the purpose of
        stripping away profit from GRHC;

I.      They constructed and promoted business models and plans that depended on
        the sale and/or management of the project companies, used those plans and
        models to obtain financing and other tangible and intangible assets, and then
        secretly changed and/or abandoned those plans and models in favor of a
        scheme to benefit themselves and leave GRHC bankrupt;

J.      They paid themselves large sums of money after they knew of should of
        known that GRHC was insolvent, or would become insolvent if the LW and/or
        FW projects were stripped from GRHC;

K.      They failed to properly organize LW, FW, LWHC-(PA and MO) and FWHC-
        (PA and MO) including failure to name GRHC as the Member of these
        companies despite representing to the World that FW and LW were
        "subsidiaries" and/or "affiliates" and/or "wholly-owned subsidiaries"
        developed and/or controlled by GRHC, despite cross-collateralizing Project
        Company debts and despite knowing the above;

L.      In March 28, 2007, they structured the Redemption Agreements for the Project
        Companies such that a disproportionate amount of debt (Sunk Costs and
        Freestream fees) was allocated to SW and/or FW instead of LW, and that
        disproportionate revenues were allocated to LW instead of SW and/or FW in
        order to further the Insiders own personal interests;

M.      On March 28, 2007, the Insiders allocated $2.5 million payment from
        Edison/Mission such that the debts of GRHC would remain unpaid but that the
        Insiders would personally profit from those funds even thought the Insiders
        knew or should have known that GRHC was unable to pay its debts;

N.      In March of 2007 they caused Edison/Mission Wind and perhaps others to
        divert receivables away from GRHC and towards entities owned by the
        Insiders for the purpose of personal gain.

177.    As a direct and proximate result of the Insiders' breach of their fiduciary duties,

GRHC did not receive any of the $13 million Redemption Price, and has lost the value of

48

GRHC's investment in the development of FW and LW Project Companies, and has otherwise sustained damages in an amount exceeding $75,000 exclusive of interest and costs as explained in the Prayer for Relief which is incorporated herein.

178.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

179.    In addition to the above false statements and representations the Insiders represented that:

A.    GRHC was to pursue and develop wind-generated electricity projects, sell them to investors, and keep an operational/management role;

B.    GRHC would receive the money paid for the sale to investors;

C.    GRHC was the sole developer of the three Pennsylvania based wind power projects known as Lookout Windpower, Forward Windpower and Stonycreek Windpower;

D.    GRHC was aware of several sites in the Commonwealth of Pennsylvania suitable for development, and would acquire those sites for development of wind power projects;

E.    GRHC would secure leases, negotiate power take off investors, and manage day-to-day financial matters for each of the projects on each of the sites;

F.    Each of the three projects developed by GRHC would be a separate entity owned and controlled by GRHC which would be sold to investor(s) and managed/operated by GRHC;

G.    That the Foundations April and October Loans would be repaid as a Sunk Cost upon the commencement of construction;

H.    That FW and/or LW were each a "wholly owned subsidiary" and an "affiliate" of GRHC and that GRHC was developing these projects;

I.   That the Foundation loans and the Black & Veatch debts would be paid from the proceeds of the sale of the Project Companies.

180.   The Insiders intended GRHC and others to rely on these representations.

181.   These representations were false.

182.   The Insiders failed to exercise reasonable care or competence to obtain or communicate true information.

183.   The representations were material.

184.   GRHC and others reasonably relied on the representations.

185.   As a direct and proximate result of the Insiders negligent and wrongful conduct, GRHC did not receive any of the $2.5 million payment on March 28, 2007, GRHC has not collected any of the $10.5 million Redemption payment due from Edison/Mission Wind, and has lost the value of GRHC's investment in the development of FW and LW Project Companies, and has otherwise sustained damages in an amount exceeding $75,000 exclusive of interest and costs as explained in the Prayer for Relief which is incorporated herein.

186.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

187.   In addition to the above, the Insiders represented that:

A.   GRHC was to pursue and develop wind-generated electricity projects, sell them to investors, and keep an operational/management role;

B.   GRHC would receive the money paid for the sale to investors;

C.   GRHC was the sole developer of the three Pennsylvania based wind power projects known as Lookout Windpower, Forward Windpower and Stoney

50

Creek Windpower;

D.     GRHC was aware of several sites in the Commonwealth of Pennsylvania suitable for development, and would acquire those sites for development of windpower projects;

E.      GRHC would secure leases, negotiate power take off investors, and manage day-to-day financial matters for each of the projects on each of the sites;

F.     Each of the three projects developed by GRHC would be a separate entity owned and controlled by GRHC which would be sold to investor(s) and managed/operated by GRHC.

G.     That the Foundations April and October Loans would be repaid as a Sunk Cost upon the commencement of construction;

H.     That FW and/or LW were each a "wholly owned subsidiary" and an "affiliate" of GRHC and that GRHC was developing these projects;

I.     That the Foundation loans and the Black & Veatch debts would be paid from the proceeds of the sale of the Project Companies.

188.   The Insiders intended GRHC and others to rely on them.

189.   These representations were false.

190.   The Insiders either knew the representations were false or did not know whether the representations were true or false,

191.   The representations were material.

192.   GRHC and others reasonably relied on the representations.

193.   As a direct and proximate result of the Insiders fraud, GRHC did not receive any of the $2.5 million payment on March 28, 2007, GRHC has not collected any of the $10.5 million Redemption payment due from Edison/Mission Wind, and has lost the value of

GRHC's investment in the development of FW and LW Project Companies, and has otherwise sustained damages in an amount exceeding $75,000 exclusive of interest and costs as explained in the Prayer for Relief which is incorporated herein.

194.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

195.   The Insiders omitted to disclose and otherwise fraudulently concealed the above stated material facts which they had a duty to disclose, and which include the following:

   A.   That they had named themselves the members and owners of LW, FW, LWHC-(PA and MO), and FWHC-(PA and MO) and intended to keep any monies diverted to those companies for themselves;

   B.   The Project Companies were not subsidiaries of GRHC;

   C.   The business plan outlines in the MOU was abandoned;

   D.   The Stonycreek Deal documents were switched such that GRHC was not the "Developer" entitled to receive the Redemption Price;

   E.   GRHC was not an "affiliate" of the Project Companies;

   F.   The SW Project was non-economical and not likely to be fully developed;

   G.   GRHC was insolvent unless all three Project Companies were considered assets;

196.   The Insiders had knowledge of these material facts.

197.   GRHC and other parties transacting business with the Insiders did not know these facts and could not have discovered it by the exercise of reasonable diligence.

198.    The Insiders had a legal or equitable obligation to communicate these facts to GRHC and others (including Edison/Mission Wind).

199.    The Insiders intentionally failed to communicate the material facts.

200.    GRHC and its creditors justifiably relied on the Insiders to communicate material facts.

201.    As a direct and proximate result of the Insiders failure to disclose these material facts GRHC did not receive any of the $2.5 million payment on March 28, 2007, GRHC has not collected any of the $10.5 million Redemption payment due from Edison/Mission Wind, and has lost the value of GRHC's investment in the development of FW and LW Project Companies, and has otherwise sustained damages in an amount exceeding $75,000 exclusive of interest and costs as explained in the Prayer for Relief which is incorporated herein.

## COUNT 1 - 4

* * * * *  OMITTED  * * * * *

## COUNT 5

## FRAUDULENT TRANSFERS OF THE
## LOOKOUT DEVELOPMENT OPPORTUNITY

COMES NOW the Trustee for his fraudulent transfer claims against LW, LWHC-PA, LWHC-MO, and the Insiders. In furtherance thereof, the Trustee alleges as follows:

202.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

203.   GRHC used its resources, assets and offices to identify the Lookout development opportunity and begin development of that project, which GRHC did simultaneously with the development of SW and FW located in the same County (Somerset) in Pennsylvania.

204.   The Trustee disputes the validity of the Insiders' manipulative transfers of the Lookout project development and redemption opportunities and, once matured, membership interests. The Insiders claim to have accomplished the following transfers:

| Transferor   LW % | Transferee | Related Event |
|---|---|---|
| **A.**   **GRHC ➔➔(100%)➔➔ Insiders**: | | The new LW entity owned by Insiders captures/transferred the LW opportunity. Occurred shortly before MOU was signed. |
| **B.**   **Insiders➔➔(100%)➔➔LWHC-PA**: | | Undocumented attempted transfer of LW membership interests shortly before 2/3/06 Stonycreek Deal. |
| **C.**   **LWHC-PA ➔➔(50%)➔➔Edison**: | | Amended Operating Agreement attempting to transfer half the LW interests as part of Stonycreek Deal. |
| **D.**   **LWHC-PA➔➔(50%)➔➔LWHC-MO** | | Undocumented attempted transfer to new LLC owned by Insiders shortly before 3/28/07 Redemption Agreement signed. |
| **E.**   **LWHC-MO ➔➔(50%)➔➔Edison**: | | 3/28/07 Redemption Agreement makes this transfer as consideration for right to receive Final Installment. |

205.   Transfer "B" (Insiders to LWHC-PA) is legally invalid because it is required to be in writing and there is no writing.

206.   Transfer "C" (LWHC-PA to Edison) is legally invalid because LWHC-PA was not a member of LW (because transfer "B" is invalid) and did not have the authority to amend LW's original Operating Agreement.

207.   Transfer "D" (LWHC-PA to LWHC-MO) is legally invalid because it is undocumented, and any change in LW membership is required to be in writing. It also required the consent of Edison which was not requested or given.

208.   Transfer "E" (LWHC-MO to Edison) is legally invalid because LWHC-MO was not a member of LW (because transfers A, B and D are invalid) and had no authority to amend or otherwise effect the LW project opportunity.

209.   All these transfers are part of a pattern of fraud designed to separate the approximate $6 million development cost from the $13 million redemption revenue such that the Insiders keep all the revenue and pay none of the costs.

210.   Counts 5, 6 and 7 of this Amended Complaint request remedies for fraudulent transfers "A" (GRHC to Insiders), "B" (Insiders to LWHC-PA) and "D" (LWHC-PA to LWHC-MO) above. The claims are sequential meaning that any transfer following a voided or illegal transfer is likewise void.

211.   By transferring the Lookout development opportunity (which included the expectation of a profitable sale and which was bundled into the LW entity) from GRHC to the Insiders, the Insiders directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment,

expectation and opportunity to complete development of the LW project and receive payment therefore.

212.    The Lookout development opportunity and expectation matured into the expectation to receive the Redemption Price payments from Edison. The First Installment was $1 million and the remaining Final Installment is $10.5 million.

213.    The Insiders made the transfers with the actual intent to hinder, delay or defraud GRHC and its creditors.

214.    GRHC did not receive a reasonably equivalent value in exchange for any of the transfers, and GRHC (A) was engaged in a business transaction (developing wind farms) for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability to pay when due.

215.    The transfer was to insiders as defined by K.S.A. §33-201(g).

216.    The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical effect was the Insiders controlled all the entities except Edison.

217.    However, the truth was the GRHC was not in possession or control of LW or the opportunity to develop and sell the project.

218.   The Insiders concealed the transfer and misrepresented that GRHC was and would be the developer of all three projects and receive the financial benefits of their development and sale.

219.   The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. Additionally, by the summer of 2005 the SW project appeared to have little value.

220.   The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves and even suing for recovery of the $10.5 million Final Installment due from Edison.

221.   GRHC did not receive reasonable value or consideration for its interest.

222.   GRHC was or became insolvent shortly after the transfer.

223.   The transfers occurred shortly before a substantial debt was incurred and/or payment was due (e.g., the MOU terms including the Foundation and B&V debt extensions).

224.   The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and the Insiders manipulated the allocation of income and expenses as between the Project Companies such that the interest in LW was the only real asset.

225.   As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against the Insiders and LW and its putative successors LWHC-PA and LWHC-MO, jointly and severally, in an amount not less than $11.507 million plus interest and costs  as is further explained in the Prayer for Relief which is incorporated herein. This amount specifically includes the $1 million First Installment paid to LWHC-MO which was siphoned off by the Insiders personally.

226.   Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which would be fair, just and equitable under the circumstances:

A.   The Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the Lookout project including the right to be paid the Redemption Price. GRHC's interest has been bound up in the LW entity and, therefore, replacing the Insiders as the members of LW with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy;

B.   The Trustee requests  an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of the Insiders' claimed interest in LW;

C.   The Trustee requests an injunction against further disposition by the transferees of the asset transferred;

D.   The Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or

E.   The Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC.

## COUNT 6

### FRAUDULENT TRANSFER OF THE
### LOOKOUT REDEMPTION OPPORTUNITY TO LWHC-PA

COMES NOW the Trustee for his fraudulent transfer claims against Lookout Windpower Holding Company, LLC (PA), and its members, Insiders Robert H. "Bob" Gardner, Robbin M. Gardner, R. James "Jim" Ansel, Virgina Z. Ansel, William W. "Bill" Stevens, and Akiko N. Stevens. In furtherance thereof, the Trustee alleges as follows:

227.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Complaint.

228.   The Insiders claim they transferred their membership interests in LW from themselves personally to LWHC-PA. The LW Operating Agreement requires such transfers to be in writing and there is no writing. However, in the event that transfer is legally valid, the Trustee asserts this claim.

229.   The Insiders further claim LWHC-PA transferred half its ownership of LW to Edison on 2/3/2006 as part of the Stonycreek Deal (via an Amended and Restated Operating Agreement) and the remaining half will, pursuant to the 3/28/2007 Redemption Agreement, be transferred upon payment of the Final Installment.

230.   The transfer to be avoided in this claim is the transfer of the LW membership interest from the Insiders personally to LWHC-PA. This second transfer should have been to GRHC and not LWHC-PA, because GRHC was the developer of LW.

231.   The February 2002 Loan Application said GRHC would be the developer, the December 2004 Loan Application said the Project Companies were wholly-owned subsidiaries, the July 2005 MOU stated GRHC was the developer, as did the January 2006 draft Development Agreements, as did the draft March 2007 Redemption Agreements.

232.   The putative transfer of LW membership interests directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment, expectation and opportunity in LW which includes the right to receive the Redemption Price from Edison/Mission Energy.

233.   The Insiders transferred their interest in LW to LWHC-PA with the actual intent to hinder, delay or defraud GRHC and its creditors, and to keep the Redemption Price for themselves without paying the debt owed by GRHC.

234.   GRHC did not receive a reasonably equivalent value in exchange for the transfer and GRHC (A) was engaged in a business transaction for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability to pay when due.

235.   The transfer was to an insider as defined by K.S.A. §33-201(g).

236.   The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical reality was GRHC was in control. However, the legal

reality manipulated by the Insiders was that GRHC was not in possession or control of LW or the right to payment of any Redemption Price.

237. The Insiders concealed that GRHC was and would be the developer of all three projects and receive the financial benefits of their development and sale.

238. The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. The Trustee is not in possession of any material assets.

239. The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves.

240. GRHC did not receive reasonable value or consideration for its interest.

241. GRHC was or became insolvent shortly after the transfer.

242. The transfer occurred shortly before a substantial debt was incurred (e.g., the 2/3/06 closing of the Stonycreek Deal).

243. The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and the Insiders manipulated the allocation of income and expenses as between the Project Companies such that the interest in LW was the only real asset.

244.    As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against LWHC-PA and the Insiders, jointly and severally, in an amount not less than $11.5 million plus interest and costs, as is further explained in the Prayer for Relief which is incorporated herein. This amount specifically includes the $1 million First Installment paid to LWHC-PA and siphoned off by the Insiders personally.

245.    Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which are fair, just and equitable under the circumstances:

A.      Pursuant to K.S.A. §33-207 (a)(1) the Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the Lookout project and LW including the right to be paid the remainder of the Redemption Price. GRHC's interest has become bound up in the LWHC-PA entity and, therefore, replacing the Insiders as the members of LWHC-PA with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy.[4]

B.      Pursuant to K.S.A. §33-207(a)(2) the Trustee requests an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of the Insiders' claimed interest in LW;

C.      Pursuant to K.S.A. §33-207(a)(3)(A) the Trustee requests an injunction against further disposition by the transferee of the asset transferred;

D.      Pursuant to K.S.A. §33-207(a)(3)(B) the Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the

---

[4] Equitably reforming the LWHC-PA Operating Agreement to install GRHC as the owner of LWHC-PA will, assuming the previously referenced assumptions (which the Trustee disputes) are accurate, allow GRHC to be paid the Final Installment of the Redemption Price *unless LWHC-MO is the Developer Member who executed the Redemption Agreement.* If LWHC-MO is the transferee of the Insiders interest in LW, then this claim is replaced by a nearly identical claim against LWHC-MO. *See Count 7.*

transferee; and/or

E.    Pursuant to K.S.A. §33-207(a)(3) (B) the Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC (both the $10.5 remaining and the $2.5 paid previously).

## COUNT 7

### FRAUDULENT TRANSFER OF THE
### LOOKOUT REDEMPTION OPPORTUNITY TO LWHC-MO

COMES NOW the Trustee for his fraudulent transfer claims against Lookout Windpower Holding Company, LLC (PA), Lookout Windpower Holding Company, LLC (MO), The Gardner Family Investment Company, LLC, The Stevens Family Investment Company, LLC, and the John Doe Company, and Insiders Robert H. "Bob" Gardner, Robbin M. Gardner, R. James "Jim" Ansel, Virgina Z. Ansel, William W. "Bill" Stevens, and Akiko N. Stevens. In furtherance thereof, the Trustee alleges as follows:

246.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

247.    The Insiders have claimed they transferred their original membership interests in LW from themselves personally to LWHC-PA. On 12/1/06 the formed LWHC-MO and thereafter claim to have caused LWHC-PA to transfer all of its membership interests in LW from LWHC-PA to LWHC-MO at some point in early 2007. The LW Operating Agreement requires such transfers to be in writing and there is no writing. However, in the event that transfer is legally valid, the Trustee asserts this claim.

63

248.    The Insider husband and wife duos next claim that they have transferred each of their one-third ownership in LWHC-MO to their respective Family Investment Companies (including the John Doe Company for the Ansells). That transfer is subject to the same claims as those against LWHC-MO and to the extent those Family Investment Companies hold any interest in LW, then that interest should be set aside. For purposes of this claim, and subject to the preceding statement, the Family Investment Companies are included within "LWHC-MO."

249.    The transfer to be avoided in this claim is the transfer of the LW membership interest from LWHC-PA to LWHC-MO. This transfer should have been to GRHC and not LWHC-MO, because GRHC was the developer of LW. The February 2002 Loan Application said GRHC would be the developer, the December 2004 Loan Application said the Project Companies were wholly-owned subsidiaries, the July 2005 MOU stated GRHC was the developer, as did the January 2006 draft Development Agreements, as did the draft March 2007 Redemption Agreements.

250.    The putative transfer of LW membership interests directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment, expectation and opportunity in LW which includes the right to receive the Redemption Price from Edison/Mission Energy.

251.    The Insiders transferred the interest of LWHC-PA in LW to LWHC-MO with the actual intent to hinder, delay or defraud GRHC and its creditors, and to keep the Redemption

Price for themselves without paying the debt owed by GRHC.

252.   GRHC did not receive a reasonably equivalent value in exchange for the transfer and GRHC (A) was engaged in a business transaction for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability to pay when due.

253.   The transfer was to an insider as defined by K.S.A. §33-201(g).

254.   The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical reality was that the members of GRHC were in control. However, the legal reality manipulated by the Insiders was that GRHC was not in possession or control of LW or the right to payment of any Redemption Price.

255.   The Insiders concealed that GRHC was not the named Developer Member and would not receive the financial benefits of the Project Companies development and sale.

256.   The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. The Trustee is not in possession of any material assets.

257.   The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves.

65

258.   GRHC did not receive reasonable value or consideration for its interest.

259.   GRHC was or became insolvent shortly after the transfer.

260.   The transfer occurred shortly before a substantial sum was to be paid (e.g., the 3/28/2007 Redemption Agreements and payment of the $1 million First Installment) for the purpose of isolating and capturing the First Installment and, more importantly, the second and Final Installment.

261.   The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and the Insiders manipulated the allocation of income and expenses as between the Project Companies such that the interest in LW was the only real asset.

262.   As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against LWHC-MO, LWHC-PA, and the Insiders, jointly and severally, in an amount not less than $11.507 million plus interest and costs as is further explained in the Prayer for Relief which is incorporated herein. This amount specifically includes the $1 million First Installment paid to LWHC-MO and siphoned off by the Insiders personally.

263.   Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which are fair and just under the circumstances:

A.   The Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the LW Project Company including the right to be paid the remainder of the Redemption Price. GRHC's interest is now bound up in the LW entity which under this theory is bound up in the LWHC-MO entity. Therefore, replacing the Insiders as the members of LWHC-MO with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy.[5]

B.   The Trustee requests  an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of LWHC-MO's claimed interest in LW;

C.   The Trustee requests an injunction against further disposition by the transferee of the asset transferred;

D.   The Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or

E.   The Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC (both the $10.5 remaining and the $2.5 paid previously).

## COUNT 8

### FRAUDULENT TRANSFERS OF THE
### FORWARD DEVELOPMENT OPPORTUNITY

COMES NOW the Trustee for his fraudulent transfer claims against FW, FWHC-PA,

FWHC-MO, Robert H. "Bob" Gardner, Robbin M. Gardner, R. James "Jim" Ansel, Virgina

Z. Ansel, William W. "Bill" Stevens, and Akiko N. Stevens. In furtherance thereof, the

---

[5]  Equitably reforming the LWHC-MO Operating Agreement to install GRHC as the owner of LWHC-MO will, assuming the previously referenced assumptions (which the Trustee disputes) are accurate, allows GRHC to be paid the Final Installment of the Redemption Price *unless LWHC-PA is the Developer Member who executed the Redemption Agreement.* If LWHC-PA is the transferee of the Insiders interest in LW, then this claim is replaced by a nearly identical claim against LWHC-PA. *See Count 6.*

Trustee alleges as follows:

264.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

265.    GRHC used its resources, assets and offices to identify the Forward development opportunity and begin development of that project, which GRHC did simultaneously with the development of SW and LW located in the same County (Somerset) in Pennsylvania.

266.    The Trustee disputes the validity of the Insiders' manipulative transfers of the Forward project development and redemption opportunities and, once matured, membership interests. The Insiders claim to have accomplished the following transfers:

| Transferor   FW % | Transferee | Related Event |
|---|---|---|
| A.    GRHC �'t�'t(100%)➟➟ Insiders: | | The new FW entity owned by the Insiders captured / transferred the FW opportunity. Occurred 8/26/04. |
| B.    Insiders➟➟(100%)➟➟FWHC-PA: | | Undocumented attempted transfer of FW membership interests shortly before 2/3/06 Stonycreek Deal. |
| C.    FWHC-PA ➟➟(50%)➟➟Edison: | | Amended Operating Agreement attempting to transfer half the FW interests as part of 2/3/06 Stonycreek Deal. |
| D.    FWHC-PA➟➟(50%)➟➟FWHC-MO | | Undocumented attempted transfer to new LLC owned by Insiders shortly before 3/28/07 Redemption Agreement signed. |
| E.    FWHC-MO ➟➟(50%)➟➟Edison: | | 3/28/07 Redemption Agreement makes this transfer. |

267.   Transfer "B" (Insiders to FWHC-PA) is legally invalid because it is required to be in writing and there is no writing.

268.   Transfer "C" (FWHC-PA to Edison) is legally invalid because FWHC-PA was not a member of FW (because transfer "B" is invalid) and did not have the authority to amend FW's original Operating Agreement.

269.   Transfer "D" (FWHC-PA to FWHC-MO) is legally invalid because it is undocumented, and any change in FW membership is required to be in writing. It also required the consent of Edison which was not requested or given.

270.   Transfer "E" (FWHC-MO to Edison) is legally invalid because FWHC-MO was not a member of FW (because transfers A, B and D are invalid) and had no authority to amend or otherwise effect the FW project opportunity.

271.   All these transfers are part of a pattern of fraud designed to separate the approximate $6 million development cost from the $13 million redemption revenue such that the Insiders keep all the revenue and pay none of the costs.

272.   Counts 8, 9 and 10 of this Amended Complaint request remedies for fraudulent transfers "A" (GRHC to Insiders), "B" (Insiders to FWHC-PA) and "D" (FWHC-PA to FWHC-MO) above. The claims are sequential meaning that any transfer following a voided or illegal transfer is likewise void.

273.   By transferring the Forward development opportunity (which included the expectation of a profitable sale and which was bundles into the FW entity) from GRHC to the Insiders,

the Insiders directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment, expectation and opportunity to complete development of the FW project and receive payment therefore.

274.   The Forward development opportunity and expectation matured into the expectation to receive the Redemption Price payments from Edison. The First Installment was $1.493 million and the Final Installment is zero.

275.   The Insiders made the transfers with the actual intent to hinder, delay or defraud GRHC and its creditors.

276.   GRHC did not receive a reasonably equivalent value in exchange for any of the transfers, and GRHC (A) was engaged in a business transaction (developing wind farms) for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability to pay when due.

277.   The transfer was to insiders as defined by K.S.A. §33-201(g).

278.   The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical effect was the Insiders controlled all the entities except Edison.

279.   However, the truth was the GRHC was not in possession or control of FW or the opportunity to develop and sell the project.

280.   The Insiders concealed the transfer and misrepresented that GRHC was and would be the developer of all three projects and receive the financial benefits of their development and sale.

281.   The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. Additionally, by the summer of 2005 the SW project appeared to have little value.

282.   The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves and even suing for recovery of the $10.5 million Final Installment due from Edison.

283.   GRHC did not receive reasonable value or consideration for its interest.

284.   GRHC was or became insolvent shortly after the transfer.

285.   The transfers occurred shortly before a substantial debt was incurred and/or payment was due.

286.   The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and

71

the Insiders manipulated the allocation of income and expenses as between the Project Companies such that the interest in LW was the only real asset.

287.    As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against the Insiders and FW and its putative successors FWHC-PA and FWHC-MO, jointly and severally, in an amount not less than $1.493 million plus interest and costs as is further explained in the Prayer for Relief which is incorporated herein.

288.    Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which are fair and just under the circumstances:

A.      The Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the Forward project including the right to be paid the Redemption Price. GRHC's interest has been bound up in the FW entity and, therefore, replacing the Insiders as the members of FW with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy;

B.      The Trustee requests  an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of the Insiders' claimed interest in FW;

C.      The Trustee requests an injunction against further disposition by the transferees of the asset transferred;

D.      The Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or

E.      The Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC.

## COUNT 9

### FRAUDULENT TRANSFER OF THE
### LOOKOUT REDEMPTION OPPORTUNITY TO FWHC-PA

COMES NOW the Trustee for his fraudulent transfer claims against FWHC-PA, Insiders Robert H. "Bob" Gardner, Robbin M. Gardner, R. James "Jim" Ansel, Virgina Z. Ansel, William W. "Bill" Stevens, and Akiko N. Stevens. In furtherance thereof, the Trustee alleges as follows:

289.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

290.   The Insiders claim they transferred their membership interests in FW from themselves personally to FWHC-PA. The FW Operating Agreement requires such transfers to be in writing and there is no writing. However, in the event that transfer is legally valid, the Trustee asserts this claim.

291.   The Insiders further claim FWHC-PA transferred half its ownership of FW to Edison on 2/3/2006 as part of the Stonycreek Deal (via an Amended and Restated Operating Agreement) and the remaining half was transferred 3/28/2007 via the FW Redemption Agreement.

292.   The transfer to be avoided in this claim is the transfer of the FW membership interest from the Insiders personally to FWHC-PA. This second transfer should have been to GRHC and not FWHC-PA, because GRHC was the developer of FW.

293.   The February 2002 Loan Application said GRHC would be the developer, the December 2004 Loan Application said the Project Companies were wholly-owned subsidiaries, the July 2005 MOU stated GRHC was the developer, as did the January 2006 draft Development Agreements, as did the draft March 2007 Redemption Agreements.

294.   The putative transfer of FW membership interests directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment, expectation and opportunity in FW which includes the right to receive the Redemption Price from Edison/Mission Energy.

295.   The Insiders transferred their interest in FW to FWHC-PA with the actual intent to hinder, delay or defraud GRHC and its creditors, and to keep the Redemption Price for themselves without paying the debt owed by GRHC.

296.   GRHC did not receive a reasonably equivalent value in exchange for the transfer and GRHC (A) was engaged in a business transaction for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability to pay when due.

297.   The transfer was to an insider as defined by K.S.A. §33-201(g).

298.   The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical reality was GRHC was in control. However, the legal

reality manipulated by the Insiders was that GRHC was not in possession or control of FW or the right to payment of any Redemption Price.

299.   The Insiders concealed that GRHC was and would be the developer of all three projects and receive the financial benefits of their development and sale.

300.   The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. The Trustee is not in possession of any material assets.

301.   The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves.

302.   GRHC did not receive reasonable value or consideration for its interest.

303.   GRHC was or became insolvent shortly after the transfer.

304.   The transfer occurred shortly before a substantial debt was incurred (e.g., the 2/3/06 closing of the Stonycreek Deal).

305.   The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and the Insiders manipulated the allocation of income and expenses as between the Project Companies such that the interest in LW was the only real asset.

306.    As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against FWHC-PA and the Insiders, jointly and severally, in an amount not less than $1.493 million plus interest and costs, as is further explained in the Prayer for Relief which is incorporated herein.

307.    Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which are fair and just under the circumstances:

A.      The Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the Forward project and FW including the right to be paid the Redemption Price. GRHC's interest has become bound up in the FWHC-PA entity and, therefore, replacing the Insiders as the members of FWHC-PA with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy.[6]

B.      The Trustee requests an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of the Insiders' claimed interest in FW;

C.      The Trustee requests an injunction against further disposition by the transferee of the asset transferred;

D.      The Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or

E.      The Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC (both the $10.5 remaining and the $2.5 paid previously).

---

[6] Equitably reforming the FWHC-PA Operating Agreement to install GRHC as the owner of FWHC-PA will, assuming the previously referenced assumptions (which the Trustee disputes) are accurate, allow GRHC to be paid the full Redemption Price *unless FWHC-MO is the Developer Member who executed the Redemption Agreement.* If FWHC-MO is the transferee of the Insiders interest in FW, then this claim is replaced by a nearly identical claim against FWHC-MO. *See Count 10.*

## COUNT 10

## FRAUDULENT TRANSFER OF THE
## FORWARD REDEMPTION OPPORTUNITY TO FWHC-MO

COMES NOW the Trustee for his fraudulent transfer claims against FWHC-MO, The

Gardner Family Investment Company, LLC, The Stevens Family Investment Company, LLC,

and the John Doe Company, and Insiders Robert H. "Bob" Gardner, Robbin M. Gardner, R.

James "Jim" Ansel, Virgina Z. Ansel, William W. "Bill" Stevens, and Akiko N. Stevens. In

furtherance thereof, the Trustee alleges as follows:

308.    The Trustee incorporates by reference as though fully set forth all other paragraphs

in this Amended Complaint.

309.    The Insiders have claimed they transferred their original membership interests in FW

from themselves personally to FWHC-PA. On 12/1/06 they formed FWHC-MO and

thereafter claim to have caused FWHC-PA to transfer all of its membership interests in FW

from FWHC-PA to FWHC-MO. The FW Operating Agreement requires such transfers to be

in writing and there is no writing. However, in the event that transfer is legally valid, the

Trustee asserts this claim.

310.    The Insider husband and wife duos next claim that they have transferred each of their

one-third ownership in FWHC-MO to their respective Family Investment Companies

(including the John Doe Company for the Ansells). That transfer is subject to the same claims

as those against FWHC-MO and to the extent those Family Investment Companies hold any

interest in FW, then that interest should be set aside. For purposes of this claim, and subject

to the preceding statement, the Family Investment Companies are included within "FWHC-MO."

311.    The transfer to be avoided in this claim is the transfer of the LW membership interest from FWHC-PA to FWHC-MO. This transfer should have been to GRHC and not FWHC-MO, because GRHC was the developer of FW. The February 2002 Loan Application said GRHC would be the developer, the December 2004 Loan Application said the Project Companies were wholly-owned subsidiaries, the July 2005 MOU stated GRHC was the developer, as did the January 2006 draft Development Agreements, as did the draft March 2007 Redemption Agreements.

312.    The putative transfer of FW membership interests directly or indirectly, absolutely or conditionally, voluntarily or involuntarily, did transfer, dispose or otherwise cause GRHC to part with GRHC's interest, investment, expectation and opportunity in FW which includes the right to receive the Redemption Price from Edison/Mission Energy.

313.    The Insiders transferred the interest of FWHC-PA in FW to FWHC-MO with the actual intent to hinder, delay or defraud GRHC and its creditors, and to keep the Redemption Price for themselves without paying the debt owed by GRHC.

314.    GRHC did not receive a reasonably equivalent value in exchange for the transfer and GRHC (A) was engaged in a business transaction for which its remaining assets were unreasonably small in relation to the business, and (B) the Insiders intended to incur, or believed or reasonably should have believed that GRHC would incur, debts beyond its ability

to pay when due.

315.   The transfer was to an insider as defined by K.S.A. §33-201(g).

316.   The Insiders represented that GRHC retained possession or control of the transferred property after the transfer and, because the Insiders owned and controlled all the related entities including GRHC, the practical reality was that the members of GRHC were in control. However, the legal reality manipulated by the Insiders was that GRHC was not in possession or control of FW or the right to payment of any Redemption Price.

317.   The Insiders concealed that GRHC was not the named Developer Member and would not receive the financial benefits of the Project Companies development and sale.

318.   The transfer was substantially all of GRHC's assets especially considering how the Insiders manipulated the allocation of the Redemption Price payments and the costs/expenses for the three Project Companies. The Trustee is not in possession of any material assets.

319.   The Insiders placed GRHC in bankruptcy (Chapter 7 liquidation) and then abandoned it, refusing to contribute capital to pay its debts and instead keeping the transferred assets/interests for themselves.

320.   GRHC did not receive reasonable value or consideration for its interest.

321.   GRHC was or became insolvent shortly after the transfer.

322.   The transfer occurred shortly before a substantial sum was to be paid (e.g., the 3/28/2007 Redemption Agreements and payment of the $1.493 million First Installment) for the purpose of isolating and capturing the First Installment.

323.   The Insiders knew or had reasonable cause to believe that GRHC would become insolvent shortly after and as a result of the transfer, because the Project Companies were the only material assets of GRHC, the SW project was recognized as being non-economical, and the Insiders manipulated the allocation of income and expenses as between the Project Companies.

324.   As a direct and proximate result of the aforementioned fraudulent transfer, GRHC is entitled to a monetary judgment for compensatory damages against FWHC-MO, FWHC-PA, and the Insiders, jointly and severally, in an amount not less than $1.493 million plus interest and costs as is further explained in the Prayer for Relief which is incorporated herein.

325.   Additionally, the Trustee is entitled to at least the following equitable and provisional remedies which would be fair and just under the circumstances:

A.   The Trustee requests avoidance of the transfer and restoration of GRHC's interest and expectation in the FW Project Company including the right to be paid the remainder of the Redemption Price. GRHC's interest is now bound up in the LW entity which under this theory is bound up in the FWHC-MO entity. Therefore, replacing the Insiders as the members of FWHC-MO with GRHC is the equivalent of avoiding the original transfer of said interest and expectancy.[7]

B.   The Trustee requests  an attachment or other provisional remedy against the asset transferred or other property of the transferee, including attachment of FWHC-MO's claimed interest in FW;

--------

[7] Equitably reforming the FWHC-MO Operating Agreement to install GRHC as the owner of FWHC-MO will, assuming the previously referenced assumptions (which the Trustee disputes) are accurate, allows GRHC to be paid the Final Installment of the Redemption Price *unless FWHC-PA is the Developer Member who executed the Redemption Agreement.* If FWHC-PA is the transferee of the Insiders interest in FW, then this claim is replaced by a nearly identical claim against FWHC-PA. *See Count 6.*

C.      The Trustee requests an injunction against further disposition by the transferee of the asset transferred;

D.      The Trustee requests appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or

E.      The Trustee requests any other relief the circumstances may require, including collapsing the various entities created and manipulated by the Insiders such that the end result is payment of the full Redemption Price to GRHC (both the $10.5 remaining and the $2.5 paid previously).

## COUNT 11

## CLAIM FOR EQUITABLE REFORMATION OR
## RECISION OF LOOKOUT DEVELOPER DOCUMENTS

COMES NOW the Trustee for his claim against all defendants (because all defendants claim to be in the chain of title for LW) for equitable reformation or recision of the Lookout Development documents that switched the identity of the "Developer" from GRHC to an entity owned and controlled by the Insiders, i.e. LWHC-PA and LWHC-MO. In furtherance thereof, the Trustee alleges as follows:

326.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Amended Complaint.

327.    This claim is for equitable reformation of the LW development documents the Insiders manipulated to steer the development debts to GRHC and the profits to themselves. Alternatively, it is for recision of those documents.

328.    The LW Operating Agreement (4/28/05) should be reformed to name GRHC as the sole member instead of the Insiders. This would nullify all subsequent transfers and

81

agreements and place GRHC where, but for the fraud of the Insiders, it should have been from the beginning.

329.   Alternatively, the last minute switch of the identity of the "Developer Member" from GRHC to LWHC-PA in the Stonycreek Deal documents should be reformed to again name GRHC as the Developer Member. The specific documents which would be reformed to restore GRHC as the Developer are:

    A.    LW Amended and Restated Operating Agreement (2/3/06).

    B.    LW Development Agreement (2/3/06).

    C.    LW Redemption Agreement (3/28/07).

330.   The end result of the requested equitable reformation would be fair and just. The only persons whose position is adversely effected is the Insiders and they are guilty of fraud and, nevertheless, may still profit. The ultimate impact would be:

| | | |
|---|---|---|
| A. | GRHC | Would be paid the $10.5 Million Final Installment which would allow GRHC to **pay the $6 million in creditor claims**, and estate expenses. Any remainder would be returned to the Insiders as owners of GRHC. |
| B. | INSIDERS | They would only receive that part of the Final Installment paid to GRHC which remained after paying GRHC creditors. The Insiders would not receive a windfall profit. |
| C. | LWHC-MO | No effect as this is an empty shell holding company. |
| D. | LWHC-PA | No effect as it is an empty shell. |
| E. | EDISON | No effect other than they will pay GRHC the Final Installment instead of one of the Insiders' shell companies. |

331.   Alternatively, the LW Operating Agreement (4/28/05) the LW Amended and Restated Operating Agreement (2/3/06), LW Development Agreement (2/3/06), LW Redemption Agreement (3/28/07) should each be rescinded as they were induced by fraud.

## COUNT 12

## CIVIL CONSPIRACY

COMES NOW the Trustee for his Civil Conspiracy claims against the Insiders. In furtherance thereof, the Trustee alleges as follows:

332.   The Trustee incorporates by reference as though fully set forth all other paragraphs in this Complaint.

333.   The Insiders devised a plan and scheme to have themselves paid the sale price for the Lookout and Forward projects and leave GRHC creditors unpaid.

334.   They planned to accomplish this by concealing and misrepresenting the relationship of GRHC with the Project Companies and holding companies, and by misdirecting the Redemption Payments to those holding companies instead of paying the debts of GRHC.

335.   There was a meeting of the minds in respect to this objective and course of action.

336.   By inventing and implementing this plan the Insiders made fraudulent and negligent misrepresentations, breached fiduciary duties, and violated 18 U.S.C. 1341 and 1343, as is more particularly described above and below.

337.   As a direct result of the conspiracy, GRHC has been damaged in an amount not less than $13 million plus interest and costs, as is further set forth in the Prayer for Relief which

is incorporated herein.

## COUNT 13

## CIVIL RICO - 18 U.S.C. §1962

COMES NOW the Trustee for his Civil RICO claim against the Insiders. In furtherance thereof, the Trustee alleges as follows:

338.    The Trustee incorporates by reference as though fully set forth all other paragraphs in this Complaint.

339.    The Insiders conspired to devise and carry out a plan designed to culminate in paying themselves the proceeds of the sale of the LW and FW projects and leave GRHC creditors unpaid, including allocating as much profit and as little expense as possible to LW.

340.    Through a pattern of racketeering activity the Insiders acquired or maintained, directly or indirectly, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

341.    The Insiders conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

342.    The Insiders conspired to do those things stated above.

343.    The Insiders utilized the U.S. Postal service and/or private and/or commercial interstate carriers to establish and incorporate all the companies, to transmit and transfer the various documents referenced, and to perpetuate their plan all in violation of 18 U.S.C. §1341.

344.   The Insiders utilized interstate telephone, facsimile and computer communications including e-mail and on-line services for the same purposes all in violation of 18 U.S.C. §1343.

345.   This conduct was performed with the purpose and intent to deprive and defraud GRHC of the LW and FW opportunities and membership interests including the sale thereof.

346.   The Insiders controlled LW, LWHC-PA, LWHC-MO, FW, FWHC-PA and FWHC-MO and caused them to execute the various documents described above, including operating agreement, amended operating agreements, development agreements, loan agreements, redemption agreements and various waivers and certifications for the purpose of carrying out the Insiders scheme to deprive and defraud GRHC of the payments due from Edison for the sale of LW and FW membership interests. In so doing the Insiders violated 18 U.S.C. §1341 and §1343.

347.   As a direct and proximate result of the Insider's violation of 18 U.S.C. §1962 GRHC has been damaged in an amount exceeding $75,000 exclusive of interest and costs, as is more fully described herein and in the Prayer for Relief which is incorporated herein by reference.

348.   Pursuant to 18 U.S.C. §1964(c) the Trustee is entitled to and hereby requests and demands treble damages, attorney fees and litigation expenses.

349.   In addition, pursuant to 18 U.S.C. 1964(b) the Trustee requests that the Court enter Orders as follows:

A.   Order the Insiders to divest themselves of any interest, direct or indirect, in any enterprise" and in particular all ownership of any of the Lookout or Forward related companies;

B.   Ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons, including without limitation reorganizing LWHC-PA and/or LWHC-MO so as to oust the Insiders and restore GRHC as the named Owner and Developer thereof so GRHC receives the Final Installment payment from Edison and not the Insiders.

C.   Ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons, including without limitation reorganizing FWHC-PA and/or FWHC-MO so as to oust the Insiders and restore GRHC as the named Owner thereof so that GRHC may recover the monies paid to FW by Edison but siphoned off by the Insiders and Freestream.

## COUNT 14

### Breach of Duty by Freestream

COMES NOW the Trustee for his breach of fiduciary duty / negligence claims against FreeStream Capital. In furtherance thereof, the Trustee alleges as follows:

350.   The Trustee incorporates by reference all the above and foregoing allegations as thought fully set forth.

351.   Freestream had a professional and fiduciary relationship with GRHC and promised to act as GRHC's financial advisor and consultant.

352.   GRHC trusted and relied upon Freestream who owed GRHC fiduciary duties.

353.   Freestream breached that duty and was otherwise negligent is permitting the Stonycreek Deal to go through with the "switched" Developer name.

354.   Freestream's agreement to represent the Insiders' personal holding companies and

corporate shells breached Freestream's duty of loyalty to GRHC.

355.    Freestream accepted the fraudulently allocated $854,263 fee paid on behalf of FW and the $250,000 fee from LW as part of the March 28, 2007 Redemption documents while knowing that GRHC received no benefit from that closing, was insolvent without the LW and FW assets, and that the Insiders planned to keep the Final Installment for themselves.

356.    Freestream knew and understood that GRHC had been the Developer of the projects, used its assets, pledges, knowledge and resources to identify and develop the LW and FW opportunities but still participated in the Insiders' plan to switch the Developer identity and keep the profits from the sales of FW and LW for themselves.

357.    As a direct and proximate result of the breach of the duty GRHC suffered damages consisting of the $13 million Redemption Price, Freestream should disgorge the undeserved monies it received from Edison, and all such other and further relief and damages as are additionally stated in the Prayer for Relief which is incorporated herein.

## PRAYER FOR RELIEF

422.    GRHC and now the Trustee has been injured and damaged as a direct and proximate result of the above described wrongful conduct of the above named defendants including in the following particulars in addition to the damages alleged above:

    A.    GRHC has been deprived of the right to the $13 million Redemption Price and payment;

    B.    GRHC has been deprived of the right to the $10,507,000 Final Installment;

C.    GRHC did not receive any part of the $1,000,000 First Installment paid to or on behalf of LWHC on March 28, 2007;

D.    GRHC did not receive any part of the $1,493,000 Redemption Price for FW paid by Edison on March 28, 2007;

E.    GRHC has not received any of the revenue from operation of the FW and/or LW facilities which began in June of 2008.

F.    GRHC has been deprived of tax benefits including PTCs and depreciation deductions;

G.    Attorney fees and litigation costs as provided by contract or statute.

H.    Punitive damages in an amount sufficient to punish the Insider defendants and deter others like them.

I.    All such other, further and additional relief as is just and proper.

WHEREFORE, the Trustee prays for judgment against each of the defendants for the relief requested above, for costs and fees as alleged, and for all such other and further relief as is just and proper.

Respectfully Submitted,

/s/ Michael P. Healy
Michael P. Healy      *Mo Bar  #37309*
Michael J. Fleming  *Mo Bar* #53970
The Healy Law Firm, L.L.C.
2600 City Center Square
1100 Main Street
Kansas City, Missouri 64105
(816) 472-8800 Telephone
(816) 472-8803 Fax